UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 4:15 CR 00049 CDP DDN |
| | ) | |
| | ) | |
| | ) | |
| RAMIZ ZIJAD HODZIC, | ) | |
| a/k/a Siki Ramiz Hodzic, | ) | |
| | ) | |
| SEDINA UNKIC HODZIC, | ) | |
| | ) | |
| NIHAD ROSIC, | ) | |
| a/k/a Yahya AbuAyesha Mudzahid, | ) | |
| | ) | |
| MEDIHA MEDY SALKICEVIC, | ) | |
| a/k/a Medy Ummuluna, | ) | |
| a/k/a Bosna Mexico, and | ) | |
| | ) | |
| ARMIN HARCEVIC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**GOVERNMENT'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE INDICTMENT**

Comes now the United States of America, by and through its attorneys, Jeffrey B. Jensen,

United States Attorney for the Eastern District of Missouri, and Matthew T. Drake, Howard J.

Marcus, and Kenneth R. Tihen, Assistant United States Attorneys for said District, Mara M. Kohn

and Joshua D. Champagne, Trial Attorneys for the United States Department of Justice, National

Security Division, Counterterrorism Section, and submit the following in response and opposition to the Defendants' collective Motions to Dismiss the Indictment.

## I.    Introduction

Defendants Ramiz Hodzic, Sedina Hodzic, Nihad Rosic (Rosic), Mediha Salkicevic (Salkicevic), and Armin Harcevic (Harcevic) have filed a Joint Motion to Dismiss Counts One and Three of the indictment for failure to state an offense. Doc. #390. Separately, defendants Ramiz Hodzic and Rosic have filed a Joint Motion to Dismiss Count Two of the indictment for failure to state an offense. Doc. #393. Additionally, the defendants have requested an evidentiary hearing on the matter.

The defense theory is that unindicted co-conspirator Abdullah Ramo Pazara (Pazara) was a lawful combatant. For that reason, the defendants argue, he could not be guilty of murder and maiming, or conspiracy to commit murder and maiming, because his conduct was "legitimate warfare." Therefore, the defendants reason, they cannot be guilty for supporting Pazara in his efforts to do so. In other words, when Pazara murdered, maimed, or conspired to murder or maim, he was a soldier, not a criminal terrorist, so the defendants did not conspire to provide material support to terrorists (Count 1, all defendants), conspire to commit murder or maiming overseas (Count 2, defendants Ramiz Hodzic and Nihad Rosic), or provide material support to terrorism (Count 3, all defendants).

Based on the following authorities and arguments, the United States respectfully requests that the Court deny the Motions to Dismiss because, as the indictment alleges, Pazara fought with and in support of a designated foreign terrorist organization whose fighters are not lawful

combatants.[1] Although defendants may seek to recast their motions as a request for a jury instruction on combatant immunity, the defendants are not entitled to this instruction nor to put on evidence in support of this defense at trial because their legal arguments are incorrect. That is, the defendants do not correctly characterize the elements of the affirmative defense of combatant immunity. For the same reasons, the defendants' request for an evidentiary hearing should be denied: there is no purpose in having an evidentiary hearing to introduce evidence to support a defense that would itself be legally deficient.

## II.     Procedural Posture and Standard of Review

As set out above, the defendants have filed motions to dismiss the indictment for failure to state an offense, arguing that the affirmative defense of lawful combatant immunity prohibits the Government from proceeding to trial. In doing so, defendants seek to challenge the facts as alleged in the indictment. In particular, defendants allege that Pazara fought with and in support of groups associated with the Free Syrian Army (FSA), rather than for designated foreign terrorist organizations (FTOs), including al Qaeda in Iraq and the Islamic State. But the indictment plainly alleges that Pazara fought with and in support of FTOs. At this stage, those facts must be accepted as true, and defendants cannot obtain dismissal of the indictment by claiming that Pazara fought for different groups than the ones alleged in the indictment. *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1951) ("[T]he familiar rule [is] that, at this stage of the case [motion to dismiss the indictment], the allegations of the indictment must be taken as true.") (cited in *United States v. Birbragher*, 603 F.3d 478, 480-81 (8th Cir. 2010); *United States v. Farm & Home Sav. Ass'n*, 932 F.2d 1256, 1259 n. 3 (8th Cir. 1991)).

---

[1] This Court has issued a Report and Recommendation to deny previous Motions to Dismiss the Indictment. Doc. #328.

The defendants have alleged in their motions that they are entitled to the affirmative defense of lawful combatant immunity. They argue that the alleged criminal conduct set out in the indictment is immunized from domestic criminal sanction based on unindicted co-conspirator Abdullah Ramo Pazara's (Pazara) status as a purported lawful combatant.

The defendants bear the burden to establish the affirmative defense of combatant immunity. *See United States v. Lindh*, 212 F. Supp. 2d 541, 557 (E.D. Va. 2002) (holding that, "it is Lindh who bears the burden of establishing the affirmative defense that he is entitled to lawful combatant immunity", and citing in support *Mullaney v. Wilbur*, 421 U.S. 684, 697-99 (1975)); *see also* Mem. Op. and Order at 6, *United States v. Ahmed et al.*, No. 15-CR-00049 (D. Minn. Feb. 10, 2016), Doc. #368 ("it is the defendant's burden to establish that they are entitled to lawful combatant immunity").[2]

To raise the affirmative defense of combatant immunity the defendants must first make a *prima facie* showing that they can produce evidence on each element of the claimed affirmative defense. *See United States v. Bailey*, 444 U.S. 394, 412 & n.9 (1980) (defendant must present evidence supporting his affirmative defense of duress or necessity before he is entitled to a jury instruction on the defense); *see also United States v. Jankowski*, 194 F.3d 878, 882 (8th Cir. 1999) ("Whether there is sufficient evidence to submit an affirmative defense to a jury is a question of law"); *United States v. Blankenship*, 67 F.3d 673, 678 (8th Cir. 1995) (upholding the district court's preclusion of a justification defense based on the insufficiency of the defendant's pretrial proffer); *United States v. May*, 727 F.2d 764, 765 (8th Cir. 1984) (evidence supporting a defense

---

[2] Moreover, "[I]t bears repeating that, at common law, the burden of proving 'affirmative defenses – indeed, 'all . . . circumstances of justification, excuse or alleviation' – rested on the defendant.'" *Dixon v. United States*, 548 U.S. 1, 8 (2006) (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977); 4 W. Blackstone, Commentaries *201)).

may be struck if the defense fails to present proof of *all* the elements); *United States v. Vasquez-Landaver*, 527 F.3d 798, 802 (9th Cir. 2008) ("We have long held that a defendant is not entitled to present a duress defense to the jury unless the defendant has made a prima facie showing of duress in a pre-trial offer of proof. Absent such a prima facie case, evidence of duress is not relevant." (citations omitted)); *United States v. Oz*, No. 13-CR-00273, 2017 WL 44941, at *4 (D. Minn. Jan. 4, 2017) (collecting cases and noting, "A pretrial proffer is necessary here so that the Court may make an informed determination about the admissibility of the evidence. Waiting until trial to make these determinations would likely cause considerable delays during the trial and potentially allow the presentation of inadmissible evidence to the jury"). As such, if a defendant asserting combatant immunity predicated on facts that conflict with the indictment's allegations succeeded in making the *prima facie* showing, the relief would not be dismissal of the indictment (as the defendants seek here), but rather permission to present the defense to the jury. As a matter of law, the defendants have not carried their burden, so the Court should deny the motion.

Thus, as explained below, defendants' motion to dismiss the indictment must be denied because fighters for the FTOs referred to in the indictment do not qualify as lawful combatants. To the extent that defendants' motions may be recast as requesting a jury instruction on combatant immunity (based on their claim that Pazara fought for groups other than those alleged in the indictment), any such motion should also be denied.

As relevant here, to be entitled to this jury instruction, the defense's instruction must correctly state the law and must be supported by the evidence. *United States v. Akers*, 987 F.2d 507, 513 (8th Cir. 1993) (jury instructions must be timely submitted, correctly state the law, and be supported by the evidence; if the defendant fails to meet any one of these requirements, he or she is not entitled to the instruction) (citing *United States v. Jerde,* 841 F.2d 818, 823 (8th

Cir.1988)); *see also United States v. Montgomery*, 819 F.2d 847, 851 (8th Cir. 1987) (jury instruction must be supported by the evidence and correctly state the law).

The defendants are not entitled to an instruction on combatant immunity here because, as discussed at length below, the defendants' characterization of the affirmative defense of combatant immunity is incorrect. Because the defendants are wrong on the law, they are not entitled to an evidentiary hearing. Evidence of a claimed defense may be excluded if the defendant's offer of proof on even one essential element is insufficient as a matter of law to support the claimed defense. *Bailey*, 444 U.S. at 416.

There is no purpose in having an evidentiary hearing to introduce evidence to support a defense that would itself be legally deficient.

## III.   Background

### A.  Designated Foreign Terrorist Organizations Relevant to the Indictment

The indictment alleges that:

> Al-Qa'ida in Iraq (hereinafter "AQI"), was a foreign terrorist organization (hereinafter "FTO") that, at various times, was also known by the following aliases: al-Nusrah Front (hereinafter "ANF"), Jabhat al-Nusrah, Jabhet al-Nusra, Is2lamic State of Iraq and the Levant (hereinafter "ISIL"), the Islamic State of Iraq and al-Sham, and the Islamic State of Iraq and Syria (hereinafter "ISIS") (hereinafter collectively referred to as "designated FTOs").

Doc. #2 at 3, ¶ 13.

On October 15, 2004, the United States Secretary of State designated AQI, then known as Jam'at al Tawhid wa'al-Jihad, as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. In January 2012, the 2004 designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act was amended to include the alias "Islamic State of Iraq" as an alias of AQI.

On or about December 11, 2012, the Department of State amended the designation of AQI to include the following aliases: al-Nusrah Front, Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant. On May 15, 2014, the Secretary of State, in response to the evolving nature of the relationships between al-Nusrah Front and AQI, amended the FTO designation of AQI to remove all aliases associated with al-Nusrah Front. Separately, the Secretary of State then designated al-Nusrah Front, also known as Jabhat al-Nusrah, also known as Jabhet al-Nusra, also known as The Victory Front, also known as Al-Nusrah Front for the People of the Levant, also known as Al-Nusrah Front in Lebanon, also known as Support Front for the People of the Levant, and also known as Jabaht al-Nusra li-Ahl al-Sham min Mujahedi al-Sham fi Sahat al-Jihad, as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224. To date, ANF remains a designated FTO.

On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary of State also added the following aliases to the FTO listing: Islamic State of Iraq and al-Sham (ISIS), Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, this group remains a designated FTO. The designated FTO is referred to herein as AQI/ISIS.

AQI/ISIS and al-Nusrah have been designated as FTOs by the Department of State. As will be established herein, these FTOs are not States and are not high contracting parties to the Geneva

Conventions of 1949. Fighting with and in support of these organizations or otherwise affiliating, associating, or acting under their direction does not qualify individuals for lawful combatant immunity.

     B.  <u>Statement of the Facts</u>

     Because the defendants have styled their pleadings as motions to dismiss, the facts in the indictment are the only facts that may be considered. *See Boyce Motor Lines*, 342 U.S. at 343 n.16; *Birbragher*, 603 F.3d at 480-81; *Farm & Home Sav. Ass'n*, 932 F.2d at 1259 n. 3. To the extent the court construes the defendants' motions such that the Court will consider extrinsic facts, the United States requests the opportunity to supplement this pleading. The indictment includes, *inter alia*, the following allegations. For purposes of a motion to dismiss, as discussed above, these allegations must be taken as true. As to the defendants:

- Pazara was a Bosnian native who immigrated to the United States, became a naturalized citizen, and resided in St. Louis, Missouri, in the Eastern District of Missouri, before leaving the United States on or about May 28, 2013. Doc. #2 at 1, ¶ 1.
- Defendants Ramiz Hodzic and Sedina Hodzic, husband and wife, were Bosnian natives who immigrated to the United States as refugees and resided in St. Louis, Missouri, in the Eastern District of Missouri. Doc. #2 at 2, ¶ 2.
- Defendant Salkicevic was a Bosnian native who immigrated to the United States, became a naturalized citizen, and resided in Schiller Park, Illinois. Doc. #2 at 2, ¶ 3.
- Defendant Harcevic was a Bosnian native who immigrated to the United States, and is a lawful permanent resident who resided in St. Louis, Missouri, in the Eastern District of Missouri. Doc #2 at 2, ¶ 4.
- Defendant Rosic was a Bosnian native who immigrated to the United States, became a naturalized citizen, and resided in Utica, New York. Doc. #2 at 2, ¶ 6.

As to the criminal conduct:

- There were individuals who were located in Serbia, Bosnia and Herzegovina, and Montenegro, who individually traveled to, and fought in, Syria, Iraq and elsewhere along with Abdullah Ramo Pazara and others with, and in support of: Al-Qa'ida in Iraq, Al-Nusrah Front, the Islamic State of Iraq and the Levant, and the Islamic State of Iraq and Syria, and who communicated with conspirators in the Eastern District of Missouri and elsewhere. Doc #2 at 3, ¶ 12.
- Pazara and other persons known to the Grand Jury facilitated the conspiracy by travelling to Syria, Iraq, and elsewhere to support the designated FTOs and act as

foreign fighters by participating in the ongoing conflict and otherwise engaging in acts of violence, to including killing and maiming persons. Doc. #2 at 5, ¶ 4.

- Defendants Siki Ramiz Hodzic and Sedina Unkic Hodzic, facilitated the conspiracy by obtaining money from members of the conspiracy and thereafter using the money to, among other things, purchase materials and supplies including: United States military uniforms, tactical combat boots, military surplus goods, tactical gear and clothing, firearms accessories, optical equipment and range finders, rifle scopes, equipment, and supplies from businesses in the Eastern District of Missouri, intending that the materials and supplies would thereafter be transferred to, and used to support, Abdullah Ramo Pazara, and others who were fighting in Syria, Iraq, and elsewhere and in support of the designated FTOs. Doc. #2 at 6, ¶ 7.

- Defendants Siki Ramiz Hodzic, Sedina Unkic Hodzic, and others known and unknown to the Grand Jury facilitated the conspiracy by shipping, or causing to be shipped, materials, supplies, and property that being: United States military uniforms, tactical combat boots, military surplus goods, tactical gear and clothing, firearms accessories, optical equipment and range finders, rifle scopes, equipment, and supplies form the Eastern District of Missouri, to third party intermediaries who subsequently transferred and provided the materials and supplies to Abdullah Ramo Pazara, and others known and unknown to the Grand Jury intending the materials to be used to support Abdullah Ramo Pazara and others who were fighting, in Syria, Iraq, and elsewhere and in support of the designated FTOs. Doc. #2 at 6, ¶ 8.

- In order to avoid detection and further the goals of the conspiracy, members of the conspiracy used telephones and online social media websites such as Facebook to send and receive messages; share or post "updates;" post "likes" and "comments;" send and receive photographs and videos; have private conversations; and otherwise communicate with members of the conspiracy. Doc. #2 at 7, ¶ 12.

- During the time period of the conspiracy, defendants Siki Ramiz Hodzic, Sedina Unkic Hodzic, Mediha Medy Salkicevic, Armin Harcevic, Jasminka Ramic, and Nihad Rosic, and Abdullah Ramo Pazara and others known and unknown used Facebook, telephones, electronic mail, and other means to: post videos, images, and messages concerning the designated FTOs; update members of the conspiracy concerning the status of Abdullah Ramo Pazara and other foreign fighters who were supporting the designated FTOs; coordinate the transfer of money, materials, and property to individuals who were supporting the designated FTOs; encourage support for Abdullah Ramo Pazara and other foreign fighters who were in Syria, Iraq and elsewhere; update one another on the activities of the designated FTOs; discuss travel plans for individuals who desired to travel to Syria and support Abdullah Ramo Pazara, and others known and unknown, who were supporting the designated FTOs; and to discuss weapons, tactics, and the violent activities of Abdullah Ramo Pazara, and others known and unknown, and who supported the designated FTOs. Doc. #2 at 8, ¶ 13.

- In order to avoid detection and further the goals of the conspiracy, members of the conspiracy used coded language to: (a) refer to persons and groups of individuals, including but not limited to the "Brothers," "Lions," "Bosnian Brothers," "mujahids," "kufars," "infidels," and "Shaheed" among other terms; (b) plan the means by which they could provide support to persons who were affiliated with and supporting the designated FTOs; (c) refer to places in Syria and Iraq, including but not limited to, "the

9

beach;" and, (d) refer to weapons, ammunition, explosives, training, fighting, and violent activities of the designated FTOs, such as "dawa," "dalwa," and "IDIS" among other terms and topics. Doc. #2 at 8, ¶ 14.

- Beginning on or about May 28, 2013, Abdullah Ramo Pazara traveled from St. Louis, Missouri, to Zagreb, Croatia, Bosnia and Herzegovina, and ultimately to Syria, where he arrived in July 2013, to support the designated FTOs by acting as a foreign fighter and otherwise engaging in acts of violence and property destruction in Syria, Iraq, and elsewhere and in support of the designated FTOs. Doc. #2 at 9, ¶ 16.

- From on or about October 16, 2013, through October 19, 2013, defendant Siki Ramiz Hodzic purchased approximately $1,913.54 in materials and supplies including: United States military uniforms, combat boots, tactical clothing and gear, military surplus goods, firearms accessories, rifle scopes, optical equipment and range finders, and other equipment from businesses in St. Louis, Missouri. Doc. #2 at 11, ¶ 29.

- On or about October 19, 2013, defendant Siki Ramiz Hodzic told Salkicevic that as soon as it (shipments) crossed the border he would send her pictures. He then sent Salkicevic a photograph depicting two long rifle scopes and told her that they go on a sniper rifle and Salkicevic replied that she hoped that they reach "them" and that they put them to good use. Doc. #2 at 11, ¶ 30.

- On or about October 28, 2013, defendant Sedina Unkic Hodzic shipped, or caused to be shipped, six boxes via the United State Postal Service containing United States military uniforms, combat boots, tactical clothing and gear, military surplus goods, firearms accessories, rifle scopes, optical equipment and range finders, first aid supplies, and other equipment to a third party intermediary in Gaziantep, Turkey, with all of the boxes arriving in Turkey by November 2013. Doc. #2 at 11-12, ¶ 31.

- On or about March 20, 2014, Abdullah Ramo Pazara told an individual known to the Grand Jury that he had just returned from a mission where they captured a large area, killed eleven individuals, captured one, and added that they intended to slaughter the prisoner the following day. Abdullah Ramo Pazara added that most of an FTO (which he identified) had joined another FTO and they were making progress, with the Islamic State spreading every day. Doc. #2 at 13, ¶ 39.

- On or about April 1, 2014, defendant Siki Ramiz Hodzic told defendant Nihad Rosic that five good snipers could do wonders there (Syria); that he watched a video of "ours" in trenches and in warfare; that "ours" downed five and slaughtered them; and, that he watched the sharia punishment of a beheading. Defendant Siki Ramiz Hodzic added that he watched a video where Abdullah Ramo Pazara's group fought through 200 kilometers, captured trenches, checkpoints, and houses and then fled. Doc. #2 at 13-14, ¶ 40.

- On or about April 25, 2014, defendant Siki Ramiz Hodzic told defendant Nihad Rosic that if he went to Syria he did not need to buy uniforms, boots, belt, jacket, or shirts because defendant Siki Ramiz Hodzic had everything ready for defendant Nihad Rosic and added that he get a night vision optic with a built-in camera for $540.00 and that when defendant Nihad Rosic killed a person, he could record it. Doc. #2 at 14, ¶ 42.

10

## IV.    Legal Standard

As discussed above, the defendants bear the burden to establish the affirmative defense of combatant immunity. As explained below, the defense cannot meet this burden because the defense of combatant immunity only applies to persons fighting on behalf of a State in an *international* armed conflict, that is, armed conflict between States. The Court need look no further than this threshold question and the Court should deny the defendants' motion because Pazara was fighting with and in support of a non-State actor in a *non-international* armed conflict.

Moreover, even in the context of an *international* armed conflict, combatant immunity is reserved for the select few categories of persons who meet the well-established criteria of prisoner of war status. The defense has wholly failed to meet the burden to show that Pazara fought for a group that satisfied those criteria. The Court need not engage in fact-finding regarding Pazara's eligibility for POW status,[3] but, even if it did, the defendants' claim also fails under that test. Finally, even if the relevant conflict were international and even if the relevant groups satisfied the criteria for POW status, defendants' claim would still fail as a matter of law because those groups' designation as FTOs renders their fighters ineligible for combatant immunity in U.S. courts.[4]

---

[3] This brief uses the terms "prisoner of war" (POW) and "lawful combatant" interchangeably. As relevant here, a member of an organization that satisfies the requirements in either Article 4(A)(1), (2), or (3) would be entitled to POW protections and be considered a lawful combatant.

[4] Even if the defendants could prove that Pazara could have asserted the defense of combatant immunity for his own actions, this would not automatically immunize the defendants for their own actions. A number of U.S. statutes prohibit conduct that can include support for lawful combatants. *See, e.g.*, 18 U.S.C. § 960 ("Whoever, within the United States, knowingly begins or sets on foot or provides or prepares a means for or furnishes the money for, or takes part in, any military or naval expedition or enterprise to be carried on from thence against the territory or dominion of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace, shall be fined under this title or imprisoned not more than three years, or both."); 18 U.S.C. § 2381; 10 U.S.C. § 904.

A.  The Affirmative Defense of Combatant Immunity is a Common Law Defense that Incorporates the Standards of the Third Geneva Convention (GPW)

Lawful combatant immunity is a doctrine reflected in international law, including the law of war (or law of armed conflict). In an international armed conflict, prisoners of war (POWs) may not be prosecuted for lawful acts of war. *Lindh*, 212 F. Supp. 2d at 553. However, the mere existence of a common law affirmative defense of combatant immunity in federal court does not mean that a defendant is immunized for criminal acts simply because he subjectively believes he has justly taken up arms in a conflict. *Id.* at 554.

Only lawful combatants are entitled to protections as POWs and therefore immune for lawful acts committed in an armed conflict. *Ex Parte Quirin*, 317 U.S. 1, 30-31 (1942) (lawful combatants are subject to capture and detention as POWs; unlawful combatants are likewise subject to capture and detention, *but also to trial and punishment*). Belligerent acts committed by lawful combatants in an international armed conflict generally, "may be punished as crimes under a belligerent's municipal law only to the extent that they violate international humanitarian law or are unrelated to the conflict." *Lindh*, 212 F. Supp. 2d at 553.

The affirmative defense of combatant immunity is a common law defense that incorporates the standards of the *Geneva Convention (III) Relative to the Treatment of Prisoners of War*, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, 1956 WL 54809 (U.S. Treaty 1956) (GPW or Third Geneva Convention), to which the United States is a party.[5] Combatant immunity doctrine has a

---

[5] The GPW itself does not afford individual defendants judicially enforceable rights or legal defenses. *See Johnson v. Eisentrager*, 339 U.S. 763, 789 n. 14 (1950) (concluding that the predecessor to the current GPW – the Third Geneva Convention of 1929 – conferred rights on alien enemies that could be vindicated "only through protests and intervention of protecting powers," not through the courts); *see also Medellin v. Texas*, 552 U.S. 491, 506 n. 3 (2008) ("background presumption is that international agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts"); *Hamdi v. Rumsfeld*, 316 F. 3d 450, 468 (4th Cir. 2003) (the Geneva Convention evince

long history preceding the GPW and is grounded in common law principles, early international conventions, statutes, and treaties. *See Lindh*, 212 F. Supp. 2d at 553.[6] However, the contemporary doctrine of combatant immunity is reflected in the provisions of the GPW, which refined and codified the international law of armed conflict. *Id.*; *United States v. Hamidullin*, 114 F. Supp. 3d 365, 380-81 (E.D. Va. 2015) (relying on GPW art. 4(A)(2) to analyze the defendant's claim to combatant immunity); *United States v. Arnaout*, 236 F. Supp. 2d 916, 917-18 (N.D. Ill.

---

no intent to provide a private right of action as if a self-executing treaty), *vacated and remanded on unrelated grounds*, 542 U.S. 507 (2004); *Tel-Oren v. Libyan Arab Rep.*, 726 F. 2d 774, 809 (D.C. Cir. 1984) (same); *cf. Noriega v. Pastrana*, 564 F.3d 1290, 1296-97 (11th Cir. 2009) (in non-criminal context, holding that the Military Commissions Act of 2006, 18 U.S.C. § 2441(e), bars the invocation of the Geneva Conventions in habeas corpus or other civil action in U.S. court).

[6] *See* Francis Lieber, *Instructions for the Government of the Armies of the United States in the Field*, Headquarters, United States Army, Gen. Order No. 100 (Apr. 24, 1863), *reprinted in The Laws of Armed Conflicts* 3 (3d ed. 1988) (Lieber Code) ("So soon as a man is armed by a sovereign government and takes the soldier's oath of fidelity, he is a belligerent; his killing, wounding, or other warlike acts are not individual crimes or offenses."); Col. William Winthrop, *Military Law and Precedents*, at 782-83 (2d ed. 1920) (observing that, "[i]t is the general rule that the operations of war on land can legally be carried on only through the recognized armies or soldiery of the State as duly enlisted or employed in its service," but, in contrast, "[i]rregular armed bodies or persons not forming part of the organized forces of a belligerent, or operating under the orders of its established commanders, are not in general recognized as legitimate troops or entitled, when taken, to be treated as prisoners of war, but may upon capture be summarily punished . . ."); *Reid v. Covert*, 354 U.S. 1, 19 n. 38 (1957) (referring to Col. Winthrop as the "Blackstone of Military Law"); *Hamdan v. Rumsfeld*, 548 U.S. 557, 597 (2006) (same); *Hague Convention (IV) Respecting the Laws and Customs of War on Land, Regulations Annexed art. 1*, Oct. 18, 1907, 36 Stat. 2277, T.S. No. 539 (Hague Convention) (U.S. is a party to Hague Convention); Int'l Comm. of the Red Cross, Commentary to Geneva Convention (III) Relative to the Treatment of Prisoners of War art. 4, 44 (Jean de Preux ed., 1960) (notion that POWs are entitled to protection was codified in multilateral treaties, including Article 1 of the Regulations Annexed to the Hague Convention, which contains the origin of the legal framework of the GPW); Brussels Declaration of 1874, Article IX, July 27, 1874, *reprinted in The Laws of Armed Conflicts* 25 (3d ed. 1988); *Manual of Military Law* 240 (British War Office 1914). Because the GPW incorporated a description of who qualifies as a POW that is very similar to, but builds in some ways upon, the description used in the Hague IV Annexed Regulations to identify who is vested with the rights and duties of war, this became a common reference for assessing who qualifies for lawful combatant status, including the privilege of combatant immunity.

2003) (denying defendant's motion to dismiss material support indictment on the ground that intended recipients of support were lawful combatants because defendant failed to demonstrate that recipients satisfied the GPW criteria); *United States v. Pineda*, No. 04-CR-232, 2006 WL 785287, at *2 (D.D.C. Mar. 28, 2006) (noting that while the doctrine of combatant immunity is derived from multiple sources of international law, "most notable for this Court's purposes is the Geneva Convention Relative to the Treatment of Prisoners of War"). Indeed, as far as the Government is aware, in every case in which a defendant has asserted combatant immunity, the court has analyzed the question according to the standards set forth in the GPW.

     B.  <u>Elements of the Affirmative Defense of Combatant Immunity</u>

The GPW reflects two overarching requirements for a valid assertion of combatant immunity. First, combatant immunity only applies in the context of an international armed conflict within the meaning of GPW Article 2. Second, even if the relevant conflict is international, the group of which the defendant was a part must satisfy the requirements in GPW Article 4 that an armed force must meet for its members to be entitled to POW status and therefore combatant immunity. Under those requirements, the group must act under the authority of a State that is a party to the conflict, and its members must (1) be commanded by a person responsible for his or her subordinates; (2) display a fixed distinctive sign; (3) carry arms openly; and (4) conduct operations in accordance with the laws and customs of war. Unless the conflict is international *and* the group satisfies the Article 4 criteria, a person may not validly assert the combatant's privilege from domestic criminal sanction. *See Lindh*, 212 F. Supp. 2d at 554 ("this immunity can be invoked only by members of regular or irregular armed forces who fight on behalf of a state and comply with the requirements for lawful combatants"); *see also United States v. Khadr*, 717 F. Supp. 2d 1215, 1222 (USCMCR 2007).

1.   *Combatant Immunity Under the GPW is Only Available to Members of the Armed Forces of a State Engaged in International Armed Conflict*

First, under the doctrine reflected in the GPW, for the defense to apply, the defendant must be engaged in an international armed conflict, as a member of armed forces of a State, or an organized belligerent group fighting on behalf of, and under the authority of, a State, in armed conflict with another State (i.e., an international armed conflict). GPW, art. 2, ¶ 1:

> Article 2: In addition to the provisions which shall be implemented in peace time, the present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them.

GPW, art. 2, ¶ 1.

An international armed conflict is a conflict between States, not merely a conflict that takes place on a global stage or straddling a border. The Supreme Court has affirmed the key distinction between international armed conflicts under Article 2 and non-international armed conflicts under Article 3. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 630-31 (2006) (an international armed conflict is an armed conflict between States*,* and Common Article 3 affords some minimal protection in non-international armed conflicts, falling short of full protection under the Conventions that is provided for international armed conflicts under Common Article 2); *see also Gherebi v. Obama*, 609 F. Supp. 2d 43, 57-58 (D.D.C. 2009) ("The distinction drawn between 'international' and 'non-international' conflicts has its roots in the Geneva Conventions, four treaties that comprise a part of 'the rules and precepts of the law of nations.'").

Under the GPW analysis applicable here, the affirmative defense of combatant immunity is categorically unavailable unless the defendant is a member of the armed forces of a State engaged in armed conflict with another State (an international armed conflict). States have

15

exclusive sovereign authority to engage in hostilities, and only those individuals acting under the authority of States may claim international legal privilege to do so.[7]

When a fighter is engaged in an international armed conflict (Article 2), this *triggers* the POW provision (Article 4, discussed below) and combatant immunity provisions (Articles 87 and 99, discussed below) of the GPW. However, absent an international armed conflict, there is no such thing as a POW and combatant immunity is categorically unavailable. *See Hamlily v. Obama*, 616 F. Supp. 2d 63, 72-73 (D.D.C. 2009) (noting that Article POW provisions do not apply to the armed conflict with Al-Qa'ida because that is a non-international armed conflict).[8]

Importantly, if the person is not a member of a State army or fighting on behalf of a State party, it is simply irrelevant how "regular" the armed group may appear, or how consistent with the law of war his or her organization's operations may be. Common Article 2. If the conflict in question is non-international, a court need not consider any other element of the combatant immunity analysis.[9]

---

[7] *See, e.g.*, Department of Defense (DoD) Law of War Manual (Dec. 2016) (The updated manual is publicly available at the "News" tab on www.Defense.gov under "Publications"), including in sections titled Belonging to a Party to the Conflict (§ 4.6.2); and Combatants—Legal Immunity and Sovereignty (§ 4.4.3.2).

[8] If the combatant's privilege were not reserved for members of forces acting under the authority of States, then the United States and other States would have to treat lawless groups as if they were regular forces responsible to and controlled by a recognized State. *Hamdan v. Rumsfeld*, 415 F.3d 33, 44 (D.C. Cir. 2005) (Williams, J., concurring) (reasoning that non-State actors cannot be parties to international armed conflicts because they "cannot sign an international treaty" or "secure protection by complying with the [GPW's] requirements").

[9] Even though combatant immunity is unavailable to fighters in a non-international armed conflict, this does not mean that non-international armed conflicts are not subject to the law of armed conflict. To the contrary, GPW Article 3 provides baseline protections for individuals in armed conflicts between a State and a non-State armed group, or between two non-State armed groups, but it expressly provides that parties to such an armed conflict may prosecute captured fighters before a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *See Hamdan*, 548 U.S. at 631-32. Thus, *combatant immunity is not one of the protections provided under Article 3 for non-State actors in non-international armed conflicts*. The POW provision (Article 4) and combatant immunity

16

2. *Even in an International Armed Conflict, Combatant Immunity is Available Only to Defendants Who Would Qualify as Prisoners of War Under the GPW*

Even assuming *arguendo* that the conflict in question was an international armed conflict and the defendant was fighting on behalf of a State recognized by the United States, for a defendant to validly assert combatant immunity he or she would also have to establish that he or she was fighting as part of a force that would qualify for POW protections under the GPW. GPW Article 4(A) reflects, in pertinent part, the forces entitled to POW protections:

(1) Members of the armed forces of a Party to the conflict as well as members of militias or volunteer corps forming part of such armed forces.

(2) Members of other militias and members of other volunteer corps, including those of organized resistance movements, belonging to a Party to the conflict and operating in or outside their own territory, even if this territory is occupied, provided that such militias or volunteer corps, including such organized resistance movements, fulfil the following conditions:

    a.  that of being commanded by a person responsible for his subordinates;

    b.  that of having a fixed distinctive sign recognizable at a distance;

    c.  that of carrying arms openly;

    d.  that of conducting their operations in accordance with the laws and customs of war.

---

provisions of the GPW (Articles 87 and 99) are only triggered in the event of an international armed conflict as provided in Article 2. *See also* Sten Verhoeven, *International and Non-International Armed Conflicts*, 3 (Instit. for Int'l Law K.U. Leuven, Working Paper No. 107, March 2007) (with the exception of Article 3 common to the four Geneva Conventions, they apply only in relation to *international* armed conflicts, which means conflicts between two high contracting parties (States or Nations)). "Article 3 is like a 'Convention in miniature'. It applies to non-international conflicts only, and will be the only Article applicable to them . . . "Int'l Comm. of the Red Cross, Commentary to Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War art. 3, 34 (Jean S. Pictet ed., 1958). Article 3, (unlike Article 2) does not trigger any other articles or recognize any other privileges present elsewhere in the four Geneva Conventions, such as combatant immunity. Moreover, non-international armed conflicts may involve State actions including military force, criminal prosecution, and the operation of transnational criminal law such as mutual legal assistance and extradition. *See generally* Dan E. Stigall & Christopher L. Blakesley, *Non-State Armed Groups and the Role of Transnational Criminal Law During Armed Conflicts*, 48 Geo. Wash. Int'l L. Rev. 1 (2015).

GPW, art. 4(A). Belligerents who also happen to fall within the scope of this definition are as a result of this qualification considered *lawful* combatants who receive the privilege to participate in hostilities and qualify for POW status if captured.

The federal courts that have addressed combatant immunity claims have focused on the fact that the overall military organization, not the individual defendant or his particular unit, did not satisfy the four criteria. *See* Mem. Op. and Order at 6, *United States v. Ahmed et al.*, No. 15-CR-00049 (D. Minn. Feb. 10, 2016), Doc. #368; *Lindh*, 212 F. Supp. 2d at 558 n.39 ("[w]hat matters for determination of lawful combatant status is not whether Lindh personally violated the laws and customs of war, but whether the Taliban did so").

As explained in the following section, a captive who qualifies for POW status pursuant to these provisions of the GPW may enjoy lawful combatant immunity.[10] However, unless both these requirements – international armed conflict and POW status – are satisfied, no fighter may validly assert this defense.

C.  A Fighter for a State in an International Armed Conflict who Qualifies for POW Status is Subject to the Combatant's Privilege

When a fighter (a) acts on behalf of a State in an international armed conflict and (b) he or she would qualify for POW protection if captured, then and only then the GPW combatant immunity provisions, Articles 87 and 99, apply:

Article 87: Prisoners of war may not be sentenced by the military authorities and courts of the Detaining Power to any penalties except those provided for in respect of members of the armed forces of the said Power who have committed the same acts.

---

[10] This understanding that only individuals who qualify for POW status may claim the combatant's privilege is central to U.S. military practice, and is reflected in the DoD Law of War Manual, notably in sections titled Combatant—Notes on Terminology—"Lawful," "Privileged," and "Qualified" (§ 4.3.2.2); Types of Lawful Combatants (§ 4.3.3); Combatants—Legal Immunity From a Foreign State's Domestic Law (§ 4.4.3); and Combatants—Legal Immunity and Sovereignty (§ 4.4.3.2).

and

> Article 99: No prisoner of war may be tried or sentenced for an act which is not forbidden by the law of the Detaining Power or by international law, in force at the time the said act was committed.

GPW, arts. 87 and 99.

In sum, the combatant's privilege under GPW Articles 87 and 99 are triggered only if the two elements of the combatant immunity defense are met. First, the threshold question is whether the conflict is an international armed conflict under Article 2. Second, if the threshold question is answered in the affirmative (i.e., the conflict is international) then the criminal defendant must also be part of a fighting force that qualifies for POW status pursuant to GPW Article 4(A). In this case, the defendants fail to satisfy their burden as to either prong of the analysis.

## V.     Analysis

The conspirators here cannot be immune for their actions because the conflict Pazara was fighting in was a non-international armed conflict and Pazara was not fighting for a State. First, as stated in the indictment, Pazara was fighting with and in support of a non-State group, i.e., AQI/ISIS, in a non-international armed conflict. The Court need inquire no further, because the defendants do not meet their burden on the first essential element of the affirmative defense of combatant immunity. Second, even if the conflict were an international armed conflict, and the defendants could somehow prove that AQI/ISIS was a militia or other volunteer corps belonging to a State, the defendants have not met their burden to show Pazara would have qualified for POW status (the four-criteria test for lawful combatancy reflected in GPW, art. 4(A)).

### A.   The Defendants Have Not Shown Pazara Fought in an International Armed Conflict

The Court should deny the defendants' Motions because the defendants have not met their burden to show Pazara was fighting in an international armed conflict. As alleged in the indictment,

Pazara was fighting with and in support of AQI/ISIS, a non-State terrorist group, in a non-international armed conflict.[11] Therefore, even if the defendants in this case can avail themselves of defenses available to Pazara, they cannot avail themselves of a combatant immunity defense.

AQI/ISIS is not involved in an international armed conflict because, although AQI/ISIS is engaged in an armed conflict(s) against a State or States, there are no States on the AQI/ISIS side of the conflict. *See* The White House, Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations at 17 n.81 (2016) (White House Report) (stating that the United States is currently engaged only in non-international armed conflicts and that, "[b]y September 2014, the Syrian Government had lost effective control of much of eastern and northeastern Syria, with much of that territory under ISIL's control"). Defendants provide no argument or authority suggesting that AQI/ISIS is involved in an international armed conflict, nor do they point to any evidence suggesting that any State is fighting on the side of AQI/ISIS.

Determinations whether an entity is a State vs. non-State, and whether hostilities involving that entity constitute an international vs. non-international armed conflict, are determinations reserved to the executive branch. *See infra* discussion of *United States v. The Three Friends*, 166 U.S. 1, 63 (1897) (*Three Friends*) and other political question cases. The United States has made clear that AQI/ISIS is a non-State actor. The United States has not committed the legal or diplomatic act of recognizing AQI/ISIS as a State. This is reflected in the White House Report, as discussed above.

---

[11] As stated above, for the purposes of a motion to dismiss, the Court accepts all well-pleaded allegations of the indictment as true.

As alleged in the indictment, Pazara fought with and in support of AQI/ISIS. Therefore, under the facts as alleged in the indictment, the defendants cannot demonstrate that Pazara was fighting for a State actor. To the extent that Pazara fought in a conflict involving a State at all, that State was Syria, on the *other side* of the conflict. As alleged in the indictment, Pazara fought with and in support of a non-State group in a non-international armed conflict, therefore the defendants cannot meet their burden to meet the threshold requirement here.

As alleged in the indictment, the defendants provided support to a fighter for a non-State armed group in a non-international armed conflict. These defendants cannot avoid prosecution by claiming combatant immunity. The Court need proceed no further than to conclude that the defense has not carried its burden to show that Pazara and other unnamed co-conspirators fought in an international armed conflict on behalf of a State.

B. Even If the Conflict at Issue Were an International Armed Conflict, the Defendants Have not Shown that Pazara Fought for a Group that Satisfied the Four-Criteria Test for POW Status

As stated above, Pazara was not involved in an international armed conflict and the Court need inquire no further. However, even if the conflict had been an international armed conflict, Pazara still could not qualify as a lawful combatant because defendants have not made a *prima facie* showing that he and his fellow fighters would have qualified for POW protections if they had been captured. *See* GPW, art. 4(A).

The defendants do not seriously contend that AQI/ISIS meets the four criteria required for lawful combatant status under GPW Article 4(A)(2). The defendants fail to cite or proffer any facts to meet their burden. It is not even clear whether the defendants argue Pazara fought for a specific armed group or are referring to "umbrella" labels for various fighting groups in Syria. Articulating a vague connection to a group or groups that were engaged in a civil war does not meet the

defendants' burden to show that fighters in Pazara's group would have been entitled to POW status if captured.

To the extent the defendants claim Pazara was fighting on behalf of another group, such as the FSA, that claim is irrelevant to these motions to dismiss the indictment, where the allegation that Pazara fought with and in support of AQI/ISIS must be taken as true. At most, defendants could seek to raise the claim that they fought for a different group as a defense at trial. However, before they would be entitled to assert such a defense, the burden remains on defendants to produce evidence on the GPW Article 4 criteria as to that specific group.

In conclusion, AQI/ISIS is a transnational terrorist group, not members of a State's armed forces, and, even if considered a militia or volunteer group, the defendants have proffered no evidence that AQI/ISIS meets the Article 4 requirements. Membership in a band of armed terrorists or criminals is manifestly not sufficient to qualify for assertion of the defense. *See United States v. Pineda*, No. 04-CR-232, 2006 WL 785287, at *4 (D.D.C. Mar. 28, 2006).

C. <u>Individuals Fighting with and in Support of Designated Foreign Terrorist Organizations Are Categorically Ineligible for Combatant Immunity under U.S. Law</u>

Even if members of AQI/ISIS satisfied the GPW requirements as lawful combatants (*i.e.* they were engaged in an international armed conflict and they satisfied the Article 4 criteria), they would still not be entitled to the lawful combatant defense because Congress has made clear that there is no combatant immunity for individuals fighting on behalf of designated foreign terrorist organizations such as AQI/ISIS. Although defendants contend that the violent acts alleged in the indictment constituted "lawful combat under United States law and are therefore immune from prosecution," Doc. #390 at 1, that contention fails at the outset. It fails because U.S. law prohibits engaging in or materially supporting combat on behalf of a designated foreign terrorist organization, regardless of whether such combat is otherwise "lawful." As explained below,

because the "combat" alleged in the indictment was conducted in support of a designated foreign terrorist organization (AQI/ISIS), that combat was not "lawful" and defendants' motion fails on that threshold ground.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No 104-132, 110 Stat. 1214, authorizes the Secretary of State to designate an entity as a "foreign terrorist organization" if he finds (1) that "the organization is a foreign organization"; (2) that "the organization engages in terrorist activity," as defined in 8 U.S.C. § 1182(a)(3)(B); and (3) that the organization's terrorist activity "threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1). It is a criminal offense for any person within the United States or subject to its jurisdiction "knowingly" to provide "material support or resources" to a designated foreign terrorist organization. 18 U.S.C. § 2339B(a)(1). The statute defines "material support or resources" as,

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). The statute thus establishes a broad ban on providing any property or service, other than "medicine or religious materials," to a designated terrorist organization. *Id.* That prohibition plainly covers engaging in combat on behalf of a designated foreign terrorist organization, and numerous individuals have been convicted for fighting (or attempting to fight) in wars on behalf of such terrorist organizations. *See, e.g.*, *United States v. Mehanna*, 735 F.3d 32, 45 (1st Cir. 2013) (upholding defendant's convictions under Sections 2339A, 2339B, and 956 where his purpose was "to basically fight in a war" on behalf of Al-Qa'ida).

It is illegal to provide material support to terrorist organizations even when that support does not further the organization's terrorist activities, is otherwise lawful, or is seemingly benign. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 29-32 (2010) (holding that Congress constitutionally prohibited even "[m]aterial support meant to 'promot[e] peaceable, lawful conduct'" of designated terrorist organizations because such support "can further terrorism by foreign groups in multiple ways."). In *Humanitarian Law Project*, the Supreme Court rejected a pre-enforcement challenge to Section 2339B brought by organizations who wished to facilitate the lawful, nonviolent purposes of designated FTOs because, as the Court explained, Congress reasonably determined that even peaceful, lawful aid to terrorist organizations "promotes the terrorist organization as a whole," enhances its perceived legitimacy, and undermines international cooperation in suppressing those groups. *Id*. at 31-33. As the Supreme Court recognized, Congress explicitly incorporated a finding into the statute that, foreign organizations that engage in terrorist activity, "'are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.'" *See id.* at 7 (quoting AEDPA, § 301(a)(7), note following 18 U.S.C. § 2339B (Findings and Purpose)). Thus, in Congress's view, even the provision of seemingly benign services (like legal advice or communications assistance) bolsters a terrorist organization's efficacy and strength in a community, thus undermining the Government's efforts to delegitimize and weaken these groups. *Id.* at 31-33; *see also Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 698 (7th Cir. 2008) ("Anyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities.").

*Humanitarian Law Project* forecloses defendants' claim that U.S. law immunizes providing support for "legitimate warfare" waged by a designated foreign terrorist organization.

Because the Court explicitly held that even lawful, peaceful material support is barred, it follows *a fortiori* that engaging in combat, even "legitimate" combat, on behalf of a designated terrorist organization is also barred. That is precisely the fact pattern alleged in the indictment. Even if *Humanitarian Law Project* were somehow distinguishable, there is no support in the statute or case law for defendants' contention that Congress intended to exempt engaging in "legitimate" combat from its otherwise comprehensive ban on supporting designated terrorist organizations. Indeed, when Congress enacted Section 2339B, it simultaneously removed an exception that had existed in § 2339A(a) (1994 ed.) for the provision of material support in the form of "humanitarian assistance to persons not directly involved in" terrorist activity. *See Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000). That repeal demonstrates that Congress considered and rejected the view that otherwise lawful aid should be permitted. Moreover, when Congress has created limited exceptions to the ban on material support, it has done so explicitly. *See* 18 U.S.C. § 2339A(b)(1) (excluding medicine and religious materials from the definition of material support). Finally, in light of Congress's intent to delegitimize designated terrorist groups and prevent their terrorist activities, it would make no sense for Congress to ban lawful, peaceful, and seemingly benign aid (like legal advice or communications assistance) for terrorist groups' non-violent and lawful activities, while simultaneously immunizing combat and combat support (such as providing the military gear at issue here) for designated terrorist groups participating in a war.

It makes no difference that the indictment here charges violations of Sections 2339A and 956 rather than specifically charging defendants with violating Section 2339B. The point is that a defendant may not assert a defense based on a claim that the alleged conduct constituted "lawful combat" when a separate statute, Section 2339B, makes clear that, under U.S., there is no such thing as "lawful combat" on behalf of a designated FTO.

25

In sum, the predicate offenses alleged in the indictment were not "lawful" under U.S. law because they were conducted with and in support of AQI/ISIS, a designated foreign terrorist organization. That fact alone requires denial of defendants' motion.

D.  Other Defense Claims

The defendants raise additional theories which similarly should be rejected by this Court.

1.  *The* Prize Cases *are Inapposite*

The defendants argue they are entitled to combatant immunity under the Civil War-era *Prize Cases*, pursuant to the theory that civil wars may constitute legitimate warfare. *See The Amy Warwick*, 67 U.S. 635 (1862) (*Prize Cases*). The defendants rely on the *Prize Cases* for the principle that immunity is available even in non-international "civil wars" in certain circumstances. However, the *Prize Cases* make clear that recognizing an entity as one that is entitled to wage legitimate warfare is a determination committed to the political branches. *See, e.g.*, *id.* at 651, 670; *see infra* discussion of *Three Friends*, 166 U.S. at 63, and other political question cases. The *Prize Cases* do not stand for the proposition that being subject to the liabilities of the law of war (e.g., seizure of ships) automatically confers the privileges of the law of war (e.g., combatant immunity).

The *Prize Cases* cited by the defendants dealt with ships that were captured by the United States during the Civil War. The vessels were seized because they violated the blockade of various ports. *Prize Cases*, 67 U.S at 640. Prize courts considered whether "prizes" of war – often ships – had been lawfully seized in time of war. If the prize was seized lawfully, a prize court could order condemnation and distribution of profits to the captain and crew of the seizing ship. If the prize was seized unlawfully, e.g., seized not during a time of war, or seized during a time of war but seized from a neutral country, the court could order the return of seized property to its owners.

In the *Prize Cases*, the Supreme Court held that the President had the legal authority to sell ships captured pursuant to a blockade of Confederate ports, even absent a declaration of war by Congress. This was because the law of war (which included seizure and sale of prize ships) came into force when the President acted to defend the United States against war brought by the Confederate States. *Prize Cases*, 67 U.S. at 647-48. The Court held that the law of war applied to the civil war between the United States and the Confederate States even though it was only a war *de facto*, and not declared by Congress. As a result, the Court concluded that the United States was justified in invoking a power derived from the law of war, specifically the power to dispose of captured vessels "at prize." The question of combatant immunity was not addressed by the Court.

The defendants argue that the civil war in Syria is "legitimate warfare" under the *Prize* factors, and that, as participants in this war, the defendants are recognized belligerents entitled to combatant immunity. However, this argument is flawed on multiple levels. At the most basic level, the defense relies on a case that reaffirms the President's authority to exercise law of war authorities, rather than a case granting combatant immunity. The factual circumstances of the *Prize Cases* cited by the defendants dealt mostly with the President's authority to conduct a defensive war, including the authority to establish naval blockades of domestic sea ports, and how property rights may be affected by war, insurgency, or insurrection.

The facts of the *Prize Cases* are wholly distinct from the allegations in the indictment and the case before this Court. In this case, it is alleged that United States citizens, including Pazara, travelled abroad to foreign soil where they took up arms. The fighters affiliated and aligned themselves with groups the United States designated as foreign terrorist organizations. The issue in the *Prize Cases* was whether the President had authority to conduct defensive warfare absent a Congressional declaration. The issue in the case at bar, as raised by the defendants' motions, is

whether non-State terrorist organizations have the authority to conduct hostilities as if they were States.

The defendants' interpretation of *The Prize Cases* is off-point and overbroad.[12] The *Prize Cases* involve the recognition of the state of war for the purposes of asserting the United States' self-defense rights against an insurgent party. But recognition of a *de facto* state of armed conflict does not necessarily afford combatant immunity to the insurgent party. *See* DoD Law of War Manual § 4.3 (distinguishing between "privileged belligerents," who are entitled to combatant immunity, and "unprivileged belligerents," who are not). Indeed, the *Prize Cases* did not even address whether combatant immunity is conferred on individuals deemed belligerent. Rather, the facts of the *Prize Cases* show that the U.S. Government claimed and exercised its own belligerent rights derived from the law of war in relation to the captured ships; there is no suggestion that the same analysis would apply to the distinct question of whether individuals fighting for the Confederacy would be deemed "privileged" belligerents entitled to combatant immunity. *Prize Cases*, 67 U.S. at 673. To the contrary of the defendants' claims, the Court in the *Prize Cases* explained that, "[t]he insurgent may be killed on the battle-field or by the executioner." *Id.* This comports with the current state of the law of non-international armed conflicts, as discussed above. That is, a State may engage both in military operations and civilian prosecutions against members of non-State armed groups.[13]

---

[12] The argument here is confined to the limited vitality of the *Prize Cases* with respect to combatant immunity and makes no comment on the continued relevance of the *Prize Cases* with respect to separation of powers analysis and executive authority to conduct foreign affairs.

[13] Put differently, members of a non-State armed group can be targeted for deliberate attack by the military because they have taken up arms in a non-international armed conflict rendering them belligerents for attack assessment. However, belligerents can be privileged or unprivileged, and only those who qualify for POW status upon capture are privileged. Thus, their targetable status does not *ipso facto* convey combatant immunity. Such immunity is reserved for lawful combatants. The principle is still valid today that in "non-international armed conflicts," i.e.,

The *Prize* "principles" invoked by the defense do not justify applicability of combatant immunity to the defendants. Those factors go to whether an armed conflict exists to which the law of war applies (as opposed to internal disturbances or riots which do not rise to the level of armed conflict). Those factors are not relevant here – there is no dispute that the conflict in Syria rises to the level of armed conflict. But the standards for determining the separate question of eligibility for combatant immunity are embodied in the GPW, not the factors defendants rely on. As mentioned above, as far as the Government is aware, in every case in which a defendant has asserted combatant immunity, the court has analyzed the question according to the standards set forth in the GPW. And, consistent with the contemporary law applicable to armed conflicts, Pazara was engaged in a non-international armed conflict, was not fighting on behalf of a State, and would not have been entitled to POW status.

> 2. *Defendants' Claim That The United States Government Supported Non-State Groups In Syria Is Irrelevant Because It Does Not Impact The Legal Status Of The Conflict Or The Combatants*

The defendants argue that the United States supported non-State groups in Syria and that this is evidence that the United States adopted the position that these groups must be recognized as lawful belligerents. Therefore, the defendants conclude, those fighting alongside purported U.S.-backed non-State groups are entitled to combatant immunity. These assertions are outside the four corners of the indictment and therefore should not be considered at this stage. However, in case the Court considers this portion of the defendants' argument as a request for a jury instruction, the defendants' analysis likewise fails. Assuming the defendants' facts *arguendo*, U.S. political support or training for groups fighting in Syria, would not constitute an act of recognition so as to

---

armed conflicts by the Government against non-State armed groups like AQI/ISIS, the Government can engage in both military operations and prosecutions in federal court against members of the non-State armed group. *See* White House Report at 36.

convey diplomatic status of recognition. That is, even if the United States provided political support or training to a non-State group, such actions would not automatically convert a non-State group to the status of a State.

The question of whether an armed group would be recognized as a lawful belligerent under U.S. law and afforded privileges such as combatant immunity is a political question. *Three Friends*, 166 U.S. at 63 ("But it belongs to the political department to determine when belligerency shall be recognized, and its action must be accepted according to the terms and intention expressed."); *Padilla v. Rumsfeld,* 352 F.3d 695, 712 (2d Cir. 2003) ("whether a state of armed conflict exists against an enemy to which the laws of war apply is a political question for the President, not the courts") (*rev'd on other grounds, Rumsfeld v. Padilla,* 542 U.S. 426 (2004) (citing *Johnson v. Eisentrager,* 339 U.S. 763, 789 (1950) and *Prize Cases,* 67 U.S. at 670); *United States v. Pineda*, No. 04-CR-232, 2006 WL 785287, at *5 (D.D.C. Mar. 28, 2006) (where the conflict at issue involved, "application of the law of war to foreign parties engaged in an internal conflict in a foreign nation when the United States is not a direct party to that conflict," the court was "particularly reluctant" to "delve into an area that may be so 'vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations' that it is 'immune from judicial inquiry or interference'") (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952)).

The expressions of the President and the State Department must not be misconstrued to have legal consequences that were not intended, and it is well established that the Executive may recognize the existence of civil war without conferring lawful belligerent status on non-State armed groups. *See Three Friends*, 166 U.S. at 64 ("For here the political department has not recognized the existence of a de facto belligerent power engaged in hostility with Spain, but has

recognized the existence of insurrectionary warfare prevailing before, at the time, and since this forfeiture is alleged to have been incurred.").

To support the argument that Pazara engaged in what the defense terms "legitimate warfare," the defendants cite a 2012 statement by then-President Barack Obama, wherein he referred to a broad coalition as, "the legitimate representative of the Syrian people." Defs.' Joint Mot. to Dismiss Counts One & Three, at 7 (citing Mark Landler, Michael R. Gordon & Anne Barnard, *U.S. Will Grant Recognition to Syrian Rebels*, *Obama Says*, N.Y. Times (Dec. 11, 2012), http://www.nytimes.com/2012/12/12/world/middleeast/united-states-involvement-in-syria.html?mcubz=0). The defense implies that then-President Obama's statement was a legal and diplomatic act that conferred legal protection on terrorist fighters such as Pazara. This assertion is incorrect for two reasons.

First, although the defense is correct in that then-President Obama did note the existence of the Syrian Opposition Coalition, the defense mischaracterizes the quote. The defense argument conflates a policy statement of support for an opposition group with a *legal* act of recognition, conferring a legitimacy recognized under the law of war, including the GPW, which reflects the relevant standards in this context. The statements quoted by the defendant, even if accurate, do not amount to a determination that members of Pazara's fighting group would be entitled to combatant immunity under the law of war. Indeed, the same New York Times article the defense cites explicitly notes that President Obama's statement was not intended to confer legal benefits or authorities. *See* Landler, Gordon & Barnard, *supra* ("But Mr. Obama's move *does not go so far as to confer on the opposition the legal authority of a state*. It does not, for example, recognize the opposition's right to have access to Syrian Government funds, take over the Syrian Embassy in Washington or enter into binding diplomatic commitments.") (emphasis added).

Critically, on December 12, 2012, hours after the interview in question, the State Department was emphatic that the President's recognition was a policy statement of support, and not a legal act of recognition:

> **QUESTION:** Victoria, what are the practical interpretations of this recognition that was made yesterday in terms of how you deal, let's say, with a diplomatic mission here in Washington?
> **MS. NULAND:** Well, *let me just underscore again that this is a political step. This is not a legal step*, this is a political step which not only allows us to give the SOC a political lift and to make it clear that they are the primary group that we will be working with, but it also allows us, as I said, to try to better channel the nonlethal assistance that we provide to the political groups that they are working with on the ground in Syria. And particularly we're interested now in using our nonlethal assistance not only for communications and for health, et cetera, but also to help with providing of essential services in those towns that have been liberated. So that's what we're going to be working on.

Victoria Nuland, Spokesperson, U.S. Dep't of State, Press Briefing (Dec. 12, 2012), https://2009-2017.state.gov/r/pa/prs/dpb/2012/12/201930.htm (emphasis added). In sum, the President's December 2012 statement did not – and did not purport to – confer a legal status upon non-State groups. The statement did not make non-State groups recognizable as States under the GPW and thus did not grant immunity to Pazara – an AQI/ISIS fighter and leader – for violations of U.S. law.

The defense argues, in essence, that because President Obama voiced political support for some groups within the Syrian Opposition Coalition, the Syrian Civil War was transformed into what the defense calls "legitimate warfare." Therefore, the defense argues, the members of such groups are "legitimate" and consequently immune from prosecution. The President of the United States did not (in the New York Times interview or anywhere) confer the status of a State upon AQI/ISIS or other non-State groups, and thus their argument fails.

Similarly, if the U.S. supported one side of a non-international armed conflict, such support does not transform the nature of that conflict to international within the meaning of the GPW, and

is therefore a legal nullity when it comes to assessing combatant immunity. The U.S. Government's notifications to the United Nations Security Council on the invocation of the right of self-defense in accordance with Article 51 of the U.N. Charter explicitly makes the point that U.S. military actions are not against Syria or its people, but against the non-State actor AQI/ISIS.[14] It is incorrect and dangerously overbroad as a legal matter to say that combatant immunity flows to an armed group *ipso facto* from the fact that the United States supports that group or any groups fighting alongside that group.

The defendants' argument here amounts to a subterfuge effort to obtain what amounts to jury nullification. This argument proves too much, because individuals are not entitled to engage in all the actions of a sovereign government, particularly when those actions violate that sovereign's laws. This echoes the fundamental distinction in the threshold test for combatant

---

[14] On September 23, 2014, the U.S. representative to the U.N. sent a letter pursuant to Article 51 of the U.N. Charter to the U.N. Secretary-General regarding the international law basis for the U.S. and coalition partners' use of force in Syria against non-State groups including AQI/ISIS (referred to in the letter as ISIL). Samantha J. Power, Permanent Rep. of the United States of America to the U.N., Letter dated Sept. 23, 2014 from the Permanent Rep. of the United States of America to the U.N. Secretary-General, U.N. Doc. S/2014/695 (Sept. 23, 2014), http://repository.un.org/bitstream/handle/11176/89298/S_2014_695-EN.pdf?sequence=21&isAllowed=y (last visited Oct. 9, 2017). The letter stated that invocation of Article 51 was permissible when "the government of the State where the threat is located is unwilling or unable to prevent the use of its territory for such attacks. The Syrian regime has shown that it cannot and will not confront these safe-havens effectively itself." The letter specifies that the action would be against AQI/ISIS and Al-Qa'ida elements. Furthermore, the Secretary General of the U.N., Ban Ki-Moon, made statements that seemed to support the "unwilling or unable" standard the U.S. offered. On September 23, 2014 (the same day Representative Powers submitted the letter) he stated, "I am aware that today's strikes were not carried out at the direct request of the Syrian Government, but I note that the Government was informed beforehand. I also note that the strikes took place in areas no longer under the effective control of that Government. I think it is undeniable – and the subject of broad international consensus – that these extremist groups pose an immediate threat to international peace and security." Ban Ki-moon, U.N. Sec'y Gen., Remarks at the Climate Summit press conference (including comments on Syria), (Sept. 23, 2014), (transcript available at https://www.un.org/sg/en/content/sg/speeches/2014-09-23/remarks-climate-summit-press-conference-including-comments-syria) (last visited Oct.9, 2017).

immunity: GPW and the common law doctrine in the U.S. treat international and non-international armed conflicts differently because they treat State actors and non-State actors differently. Here, the defendants seek to cloak themselves in the legitimacy of the United States in an attempt to immunize themselves for supporting terrorist acts.[15]

Second, the defense argues that Pazara was fighting for Jaish al-Muhajireen wal-Ansar (JMA or JAMWA) and they imply that then-President Obama's statement recognized JAMWA as a legitimate representative of the Syrian people. However, the article the defendants cite does not reference JAMWA at all. Moreover, the defense's specific allegation is impossible: President Obama *could not have* been referring to groups including JAMWA in the December 2012 interview, as the defense implies, because JAMWA was not formed until February 2013. Bureau of Counterterrorism & Countering Violent Extremism, *Designations of Foreign Terrorist Fighters*, U.S. Dep't of State (Sept. 24, 2014), https://www.state.gov/j/ct/rls/other/des/266548.htm (last visited Oct. 9, 2017). JAMWA was designated as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224 on September 24, 2014. *Id.*

---

[15] Furthermore, U.S. terrorism prosecutions are consistent with international law, and help fulfill U.S. obligations under international law with respect to the suppression of foreign terrorist fighters. A purported international law bar to the prosecution of persons in relation to civil war would be inconsistent with the efforts by States to suppress and prosecute foreign fighters returning from fighting in Syria. *See, e.g.*, United Nations Security Council Resolution 2178 (2017), U.N. Doc. S/RES/2178 (2014), Sept. 24, 2014 ("Expressing grave concern over the acute and growing threat posed by foreign terrorist fighters, namely individuals who travel to a State other than their States of residence or nationality for the purposes of the perpetration, planning, or preparation of, or participation in, terrorist acts or the providing or receiving of terrorist training, including in connection with armed conflict" and deciding that member States "shall, consistent with international human rights law, international refugee law, and international humanitarian law, prevent and suppress the recruiting, organizing, transporting or equipping of" such individuals and "the financing of their travel and of their activities").

VI.     **Conclusion**

The defendants bear the burden to establish the affirmative defense of combatant immunity. They have not done so here. To qualify for combatant immunity, a criminal defendant must fight in an *international* armed conflict on behalf of a State. Defendants have not carried their burden on this threshold question and the Court need go no further. Additionally, to qualify for combatant immunity, the defendant must fight for a group that meets the four criteria found in the GPW to qualify for POW status if captured. Again, the defendants have not carried their burden on this element of the affirmative defense. Under both elements of this analysis, Pazara and the defendants are not immune for their actions in relation to the non-international armed conflict in Syria. Even if they could secondarily avail themselves of Pazara's immunity, the defendants have not demonstrated that Pazara was entitled to combatant immunity. Finally, the fact that Pazara fought with and in support of a designated FTO forecloses defendants' combatant immunity claim, even if the group otherwise satisfied the GPW requirements.

For all the stated reasons, the Government respectfully requests that this Court hold that the defendants have not established that they are entitled to dismissal of the indictment because they have not demonstrated that they are immune from prosecution on the basis of lawful combatant immunity. If the Court construes the defendants' motions as a request for a jury instruction on the affirmative defense of lawful combatant immunity, the Court should also deny the defendants' request to hold an evidentiary hearing. There is no purpose in having an evidentiary hearing to introduce evidence to support a defense that would itself be legally deficient.

WHEREFORE, for all of the foregoing reasons, the Government respectfully requests this Honorable Court deny the defendants' Motions to Dismiss.

Respectfully Submitted,

JEFFREY B. JENSEN
United States Attorney

*/s/ Matthew T. Drake*
MATTHEW T. DRAKE – 46499MO
Assistant United States Attorney

*/s/ Howard J. Marcus*
HOWARD J. MARCUS – 29756MO
Assistant United States Attorney

*/s/ Kenneth R. Tihen*
KENNETH R. TIHEN – 37325MO
Assistant United States Attorney

*/s/ Joshua D. Champagne*
JOSHUA D. CHAMPAGNE – 1013246DC
Trial Attorney – NSD/Department of Justice
Counterterrorism Section

*/s/ Mara M. Kohn*
MARA M. KOHN – 2281SD
Trial Attorney – NSD/Department of Justice
Counterterrorism Section