**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | Case No. 4:15-CR-00049 CDP- DDN |
| vs. | | |
| RAMIZ ZIJAD HODZIC, | | |
| a/k/a Siki Ramiz Hodzic | | **DEFENDANTS' JOINT REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS COUNTS ONE AND THREE** |
| SEDINA UNKIC HODZIC, | | |
| NIHAD ROSIC, | | |
| a/k/a Yahya Abu Ayesha Mudzahid, | | |
| MEDIHA MEDY SALKICEVIC, and | | |
| a/k/a Medy Ummuluna, | | |
| a/k/a Bosna Mexico, | | |
| ARMIN HARCEVIC, | | |
| Defendants. | | |

_____

**REPLY IN FURTHER SUPPORT OF
MOTION TO DISMISS COUNTS ONE AND THREE**

The Government initially agreed that combatant immunity "is an intensely fact-specific inquiry." Doc. 261 at 36. The Court held that "a pretrial hearing might be conducted under Fed. R. Evid. 104 to decide the legal and evidentiary sufficiency of" the combatant immunity defense. Doc. 328 at 20. The Government's contention that there is no need for an evidentiary hearing is contrary to the majority of courts considering the combatant immunity defense, which have treated the combatant immunity defense as a jurisdictional requirement in determining whether the charged conduct constitutes a violation of U.S. law. The need for a hearing is particularly apparent here, because the indictment fails to allege details about Pazara's fighting in Syria. Instead, the Government relies entirely on the phrase "with and in support of" designated FTOs, which could

1

be read to mean "fighting on the same side as and in the same theater of war as" designated FTOs. There is not enough information in the indictment for the Court to resolve whether Pazara's combat activities generally complied with the laws of war.

The Government also contends that international law does not mandate extending combatant immunity to non-international armed conflict (civil war), and, thus, all combat by rebel forces in Syria is murder under United States law. Under this theory, the forces recognized by the President of the United States as representing the Syrian people are murderers.[1] Contrary to the Government's claims, the United States, both in practice and in legal decisions, has repeatedly recognized belligerent privileges for rebels under the circumstances present in the Syrian Civil War during the period of the indictment.

Finally, even if this Court determines that combatant immunity is not available as an absolute defense, the circumstances of the belligerency, including the political statements and policies of the United States toward rebel forces, allow Defendants to assert a mistake defense.

I.    **Because combatant immunity is a jurisdictional defense, the Court can consider Defendants' evidence that the groups Pazara fought with satisfied combatant immunity.**

Defendants will be able present evidence that the Free Syrian Army (FSA) and affiliated group Jaish al-Muhajireen wal-Ansar (JMA) met the four lawful combatant factors discussed in *Lindh* at the time Pazara fought for them. Defense expert, Brian Williams, travelled to Bosnia to interview people who fought alongside Pazara, and he determined that the groups Pazara actually fought with satisfied the four combatant immunity factors.[2]

---

[1] The President's statements followed the Assad regime's repeated war crimes, including targeting non-combatants, torturing and summarily executing prisoners, and using chemical weapons in violation of Common Article 3 of the Geneva Conventions and the Hague Convention.

[2] The *Lindh* court lists "four criteria an organization must meet for its members to qualify for lawful combatant status: i. the organization must be commanded by a person responsible for his

2

The Government contends there is no need for a factual hearing, because the Court is bound by the allegations in the indictment. Combatant immunity, however, is a jurisdictional defense. As one court explained, "technical 'crimes' committed by lawful combatants authorized to use force in the context of ongoing hostilities *may not be prosecuted* unless those offenses are unrelated to the conflict, or violate the law of war or international humanitarian law." *United States v. Khadr*, 717 F. Supp. 2d 1215, 1222 (C.M.C.R. 2007) (emphasis added); *see also United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 635 (1818) ("It may be said, generally, that if the government remains neutral, and recognizes the existence of a civil war, its courts *cannot consider as criminal* those acts of hostility which war authorizes") (emphasis added); *United States v. Lindh*, 212 F. Supp. 2d 541, 553 (E.D. Va. 2002) ("Lawful combatant immunity, a doctrine rooted in the customary international law of war, *forbids prosecution* of soldiers for their lawful belligerent acts committed during the course of armed conflicts against legitimate military targets.") (emphasis added).

The Supreme Court applied this same rule during the American Civil War. *See Dow v. Johnson*, 100 U.S. 158, 164 (1879) ("There would be something singularly absurd in permitting an officer or soldier of an invading army to be tried by his enemy, whose country it had invaded."). The combatant immunity doctrine also forbids prosecuting material support of protected acts. *United States v. Hamdan*, 801 F. Supp. 2d 1247, 1285-86 (U.S.C.M.C.R. 2011), *reversed in part on other ground by Hamdan v. United States*, 696 F.3d 1238, 1241 (D.C. Cir. 2012) ("Lawful enemy combatants and those lawfully aiding or *providing material support to lawful enemy combatants* receive various privileges under international law, including combatant immunity.")

---

subordinates; ii. the organization's members must have a fixed distinctive emblem or uniform recognizable at a distance; iii. the organization's members must carry arms openly; and iv. the organization's members must conduct their operations in accordance with the laws and customs of war." *United States v. Lindh*, 212 F. Supp. 2d 541, 557 (E.D. Va. 2002).

(emphasis added). When the combatant immunity defense applies, defendants are not subject to prosecution.

Because combatant immunity forbids prosecuting lawful combatants or those who support them, courts have held evidentiary hearings to determine whether the defendants were lawful combatants, whose belligerent acts were outside the courts' jurisdiction. *See Hamidullin*, 114 F. Supp. 3d at 370 (holding an evidentiary hearing at which the court considered evidence outside of the indictment); *Lindh*, 212 F. Supp. 2d at 545 n.1 (referring to the hearing the Court held). Defendants are prepared to establish their entitlement to combatant immunity at an evidentiary hearing.

Regardless, taking the indictment as true on its face would not alleviate the need for an evidentiary hearing. The Government alleges in the indictment only that Pazara and unnamed co-conspirators "fought in, Syria, Iraq and elsewhere . . . with, and in support of" designated FTOs. Doc. 2 ¶ 12. "With, and in support of" is a broad term that can include merely combat against Assad in the same theaters of war as the designated FTOs, without actually being a member of any of these organization. The Government makes clear in its response that it intends such a broad reading, arguing in the alternative that combatant activities on behalf of the FSA, or other groups aligned with the FSA, equally constitute murder and maiming. This reading demonstrates that taking the indictment on its face cannot resolve whether combatant immunity factually could exist for Pazara's combatant activities. Accordingly, this Court should follow the majority of Courts and hold an evidentiary hearing.

## II.    Combatant immunity applies in the Syrian conflict.

Contrary to the Government's argument, the Assad regime forces are not the only party to the Syrian civil war entitled to combatant immunity in a United States court. The Government's

4

argument, distilled to its essence, is that the United States can punish any of its residents for murder and maiming if they fought against the Assad regime during the Syrian Civil War. This proposition is contrary to longstanding U.S. law concerning participation in a civil war. In *Palmer*, Chief Justice Marshall observed, that, when it comes to a civil war,

> if the [United States] government remains neutral, and recognizes the existence of [the] civil war, its courts cannot consider as criminal those acts of hostility which war authorizes, and which the new government may direct against its enemy. To decide otherwise, would be to determine that the war prosecuted by one of the parties was unlawful, and would be to arrange the nation to which the court belongs against that party.

*Palmer*, 16 U.S. at 635.[3]

The Government's position improperly relies on international law, rather than United States law. United States law is the applicable law under 18 U.S.C. §§ 2339A and 956, the charging statutes. While the United States would not necessarily apply combatant immunity in every civil war, the Syrian Civil War is distinct, because the President of the United States recognized the Syrian opposition as "the legitimate representative of the Syrian people."[4]

---

[3] The facts of the *Palmer* case are largely analogous to the present case. In *Palmer*, a U.S. resident of Boson was charged with piracy based on his actions outside the United States. *Palmer*, 16 U.S. at 626. Palmer argued that the laws of war authorized his attack on a Spanish ship because he fought on behalf of rebels who declared independence from Spain. *See id.* The Supreme Court recognized that, if he were, in fact, fighting on behalf of these revolutionary forces, then his acts would not constitute piracy, but rather lawful acts of war, despite the fact that they occurred in the context of a civil war. *See id.* at 635. The Court returned the decision to the lower court to determine whether, factually, his attacks were on behalf of the rebel government or rather independent of them. *See id.*

Here, the United States alleges acts that could be independent of the rebel forces in Syria—e.g., fighting in Iraq. These are factual questions which should be determined in the first instance at a pretrial hearing to determine whether Pazara's actions were on behalf of rebel forces against Assad and, thus, immune from prosecution.

[4] NPR Staff, *Obama Recognizes Rebels As "Legitimate Representatives" of Syrian People*, NPR (Dec. 11, 2012), https://goo.gl/SwA927.

The Government's concern that adopting Defendants' position will interfere with its ability to combat terrorism is misplaced, because the Government has many tools to combat terrorism not affected by the combatant immunity doctrine. On the contrary, adopting the Government's position would have far-reaching, negative consequences that would undermine the president's ability to set foreign policy.

### A. Under United States law, combatant immunity applies in the Syrian civil war, and international law does not forbid its application.

Combatant immunity applies in civil war when the president has recognized a belligerency. *Palmer*, 16 U.S. at 635. As the Government acknowledges, the Geneva Conventions did not create combatant immunity. The doctrine existed before the Geneva Conventions and does not rely on them. Contrary to the Government's argument, the Geneva Conventions do not circumscribe the scope of the combatant immunity defense. In fact, the Geneva Conventions encourage the High Contracting Parties to apply combatant immunity in civil wars—that is, non-international armed conflicts.

It's true that, to respect national sovereignty, the Geneva Conventions did not *require* the High Contracting Parties to adopt combatant immunity in civil wars. But far from forbidding states from applying combatant immunity in civil wars, the Geneva Conventions encourage it. In its commentary on Common Article Three, which relates to the humanitarian standard for non-international armed conflicts, the International Committee of the Red Cross reasoned "that the applicable provisions represent a compulsory minimum. The words 'as a minimum' must be understood in that sense. *At the same time they are an invitation to exceed that minimum.*"[5]

---

[5] COMMENTARY ON THE GENEVA CONVENTIONS OF 12 AUGUST 1949: III GENEVA CONVENTION RELATIVE TO THE TREATMENT OF PRISONERS OF WAR 38 (Jean S. Pictet ed., 1960) (emphasis added).

The United States has always exceeded the minimum and applied combatant immunity in civil wars when the president has recognized the war's existence. Indeed, the doctrine of combatant immunity described in the Geneva Conventions developed from the common-law doctrine of combatant immunity that the United States applied during its own Civil War. Common Article Four of the Geneva Conventions, which relates to prisoners of war in international armed conflicts and includes the combatant immunity defense, was substantially influenced by the Lieber Code.[6] President Abraham Lincoln promulgated the Lieber Code during the Civil War to delineate the rules of engagement in the American Civil War.[7] Under the Lieber Code, "[m]ilitary necessity admits of all direct destruction of life or limb of armed enemies, and of other persons whose destruction is incidentally unavoidable in the armed contests of the war."[8] Because of this, the United States treated Confederate soldiers as prisoners of war, even though the United States did not recognize the Confederacy as a separate government.[9]

Federal courts followed the Lieber Code in applying the combatant immunity doctrine to the American Civil War. Supreme Court Chief Justice Salmon Chase, writing as a circuit judge, explained in *Shortridge v. Macon*, 2 AM. L. REV. 95 (C.C.D.N.C. 1868) that "[o]n no occasion, . . . and by no act, have the United States ever renounced their constitutional jurisdiction over the whole territory or over all the citizens of the republic, or conceded to citizens in arms against their country the character of alien enemies, or admitted the existence of any government *de facto*." *Id.*

---

[6] LOUIS FISHER, MILITARY TRIBUNALS & PRESIDENTIAL POWER: AMERICAN REVOLUTION TO THE WAR ON TERRORISM 71-75 (2005) (noting that the Lieber Code "heavily influenced" the Hague Convention and the Geneva Conventions).
[7] Francis Lieber, *Instructions for the Government of the Armies of the United States in the Field*, Headquarters, United States Army, Gen. Order No. 100 (Apr. 24, 1863), *available at* https://goo.gl/Gxv6rk.
[8] *Id.* Art. 15.
[9] *See id.* Arts. 52, 56.

at 99. Nevertheless, "[i]n the *Prize Cases*[,] the [S]upreme [C]ourt . . . assented the right of the United States to treat the insurgents as belligerents." *Id.* Justice Chase understood that the *Prize Cases* "recognized . . . *the fact of the exercise and concession of belligerent rights*, and affirmed, as a necessary consequence, the proposition that during the war all the inhabitants of the country controlled by the rebellion, and all the inhabitants of the country loyal to the Union, were enemies reciprocally each of the other." *Id.* (emphasis added). In other words, without surrendering its sovereignty, the United States conceded belligerent rights to the Confederacy, including combatant immunity, because President Abraham Lincoln had recognized the belligerency.

The Supreme Court elaborated in *Ford v. Surget*, 97 U.S. 594 (1878). Even though the Confederacy was not a state, "[t]he United States, from sound policy as well as humanity, conceded to the organized military forces of the Confederate States the same status and rights as if they had been engaged in warfare on behalf of a lawfully existing and independent power." *Id.* Because of this, "the Federal government" accorded "to them belligerent rights . . . shown in the treatment of captives as prisoners of war." *Dow*, 100 U.S. at 164. Analogizing to international armed conflict, the Court reasoned that "[t]here would be something singularly absurd in permitting an officer or soldier of an invading army to be tried by his enemy, whose country it had invaded." *Id.* The concession granted to the Confederacy "placed its soldiers and military officers in its service on the footing of those engaged in lawful war, and exempted them from liability for acts of legitimate warfare." *Williams v. Bruffy*, 96 U.S. 176, 187 (1877).

The United States continued to apply these principals during the Mexican Civil War. In *Ex parte Toscano*, 208 F. 938 (S.D. Cal. 1913), "a state of civil war . . . existed in the republic of Mexico." *Id.* at 939. The United States had not taken a side in the war. *Id.* Mexican belligerents entered into the territory of the United States, and the United States interned them under the law

8

of war, consistent with its position as neutral to the belligerency. *Id.* at 939-40. The petitioners argued that, because "the United States has not accorded official recognition to either party to the civil war in Mexico, neither of said parties is a nation, within the meaning of the international law, and therefore the principles of international law do not apply." *Id.* at 943. The *Toscano* court disagreed, citing the *Prize* cases. *Id.* at 943-45. Because the United States had recognized a civil war, the law of war applied to both sides. *See id.*

Contrary to the Government's argument, neither *Lindh* nor *Hamidullin* preclude this Court from applying the combatant immunity doctrine during a civil war when the United States has recognized a belligerency. *Lindh* involved an international armed conflict, so the *Lindh* court did not need to address the issue. *Lindh*, 212 F. Supp. 2d at 546. The *Hamidullin* court did not address the issue, because it assumed *arguendo* that the conflict was an international armed conflict under Article 2 of the Geneva Conventions. *Hamidullin*, 114 F. Supp. 3d at 387 ("[T]his Court need not determine whether the conflict in Afghanistan is international in nature as contemplated by Article 2 of the GPW"). Both cases involved the theory that the defendant was fighting in a war against the United States. *Lindh*, 212 F. Supp. 2d at 546; *Hamidullin*, 114 F. Supp. 3d at 383. Defendants here were alleged to be fighting in a civil war against the Assad regime when the United States was, at worst, neutral and, at best, supporting the rebel forces.

Here, the charging statutes, 18 U.S.C. §§ 2339A and 956(a), incorporate United States law. As shown above and in Defendants' initial motion, United States precedent applies combatant immunity in civil war when the president recognizes a belligerency. President Obama recognized the belligerency here by declaring the Syrian Opposition Coalition (SOC) to be "the legitimate representative of the Syrian people." The Geneva Conventions allow and encourage the United States to apply combatant immunity during civil war. Even assuming *arguendo* that customary

9

international law does not recognize combatant immunity during civil war, customary international law controls only "where there is no treaty, and no controlling executive or legislative act or jurisial decision" *The Paquete Habana*, 175 U.S. 677, 700 (1900). No treaty forbids the application of combatant immunity during a civil war, and controlling judicial decisions in the United States apply it, as least when the President has recognized a belligerency. Thus, interpreting § 2339A to incorporate the combatant immunity defense during civil war does not offend any canons of construction. *C.f. McCulloch v. Sociedad Nacional De Marineros De Hond.*, 372 U.S. 10, 21 (1963) ("[A]n act of congress ought never to be construed to violate the law of nations if any other possible construction remains") ((quoting *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)).

Therefore, the United States would apply combatant immunity during the Syrian Civil War.

**B.     President Obama's recognition of the Syrian Civil War**

Contrary to the Government's implication, the "political" nature of President Obama's recognition of the SOC as the "legitimate representative of the Syrian people" does not change the statement's import. In *Palmer*, the Supreme Court listed the multiple ways a civil wars could be recognized, stating "[i]n such contests[,] a nation may engage itself with the one party or the other—may observe absolute neutrality—may recognize the new state absolutely—or may make a limited recognition of it." *Palmer*, 16 U.S. at 634. The critical question for Justice Marshall was not what type of recognition the executive had given to the conflict, but whether he had recognized the existence of the conflict. If he had, then the judiciary was prevented from creating foreign policy by favoring one side or the other in the conflict in the course of a judicial decision. Where the United States "recognizes the existence of a civil war, its courts cannot consider as criminal those acts of hostility which war authorizes, and which the new government may direct against its

enemy." *Id.* at 635. To do otherwise would violate the United States' neutrality in the conflict by making it take one side or the other. *Id.*; *see also The Santissima Trinidad*, 20 U.S. (7 Wheat.) 283, 337 (1822) ("The government of the United States has recognized the existence of a civil war between Spain and her colonies, and has avowed a determination to remain neutral between the parties, and to allow to each the same rights of asylum and hospitality and intercourse. Each party is, therefore, deemed by us a belligerent nation having, so far as concerns us, the sovereign rights of war, and entitled to be respected in the exercise of those rights."); *The Ambrose Light*, 25 F. 408, 418 (S.D.N.Y. 1885) ("The recognition by foreign states of a state of war in civil strife, or, what is the same thing, a recognition of the belligerent rights of the insurgents, authorizes courts of law to treat the insurgents as lawful combatants.").

In the present case, it is clear at minimum that the United States has recognized the existence of a civil war in Syria. In fact, it appears to Defendants that the United States has done more and has recognized the Syrian opposition as the lawful authority in Syria. The Government contends that that the United States has merely voiced political support for the SOC. But in either case, combatant immunity applies to the combatants in the Syrian Civil War. Indeed, to hold otherwise would violate Justice Marshall's statements in *Palmer* that a court may not force the United States to take sides in a recognized civil war. By holding that none of the rebel forces is entitled to combatant immunity for their acts of legitimate warfare, this Court would take Assad's side, despite President Obama's recognition of a civil war in which the United States favored the rebel forces.[10]

---

[10] The Government's concern that applying combatant immunity in Syria would interfere with its ability to fight terrorism is misplaced. In fact, as the Government acknowledges, "[a] number of U.S. statutes prohibit conduct that can include support for lawful combatants." Section 2339A is not one of these statutes, however, because it forbids only "unlawful killings." Under United States law, killing or maiming in combat as a lawful combatant is not "unlawful." Punishing such conduct

**C.      Holding that combatant immunity does not apply in the Syrian civil war would produce absurd results.**

The Government's argument that combatant immunity does not exist in Syria would produce absurd result. First, it would require interpreting § 2339A to forbid conduct generally recognized as legal. Second, it would require interpreting § 2339A to forbid conduct that the Government has financially supported and allowed U.S. citizens to support. Finally, it would aid Assad, whom the United States has consistently opposed.

Under the Government's reasoning, every citizen who fights against a regime—regardless of whether the United States also opposes the regime—has violated § 2339A. During the conflict in Libya, United States citizens, including Chris Jeon and Matthew VanDyke, fought to overthrow Muammar Gaddafi. Mr. Jeon, a 21-year-old college student, "made his way to Tripoli to help the rebels in their final push for victory" against the Libyan government.[11] Mr. Jeon appeared on the CNN morning show, American Morning, to talk about his experiences.[12] Similarly, Mr. VanDyke "fought in the 2011 Libyan Civil War to overthrow Muammar Gaddafi."[13] He later followed "Syrian freedom fighters" opposing the Assad regime in Aleppo and returned to the United States to participate in a live interview on CNN.[14] Neither Mr. Jeon nor Mr. VanDyke was charged with

---

as unlawful would violate the United States' foreign policy in the Syrian Civil War. The Government could lawfully prosecute terrorism through 18 U.S.C. § 960, 18 U.S.C. § 2339B, or through the president's powers under the International Emergency Economic Powers Act (IEEPA). The Government could also punish *non-combatant acts* through 18 U.S.C. § 2339A.

[11] Elizabeth Flock, *American Student Chris Jeon Joins Libyan Rebels*, WASH. POST (Sept. 1, 2011), https://goo.gl/X6vvFT.

[12] *UCLA Math Major Chris Jeon Talks About Joining Rebel Fighters in Libya*, CNN's AM. MORNING, YOUTUBE, https://goo.gl/Rr7VbV.

[13] OFFICIAL WEBSITE OF MATTHEW VANDYKE, *Home Page*, https://goo.gl/ErWJYF (last accessed Nov. 21, 2017).

[14] *Flimaker* [sic] *Follows Syrian Rebels*, CNN, YOUTUBE, https://goo.gl/FXGA2T.

material support of terrorism under § 2339A. Under the Government's reading of § 2339A, however, both violated § 2339A, because the Libyan conflict was a civil war.

The United States has also routinely permitted United States citizens to travel to Syria to fight against ISIL. As of 2016, there were "over 100 U.S. citizens estimated to have traveled to Syria and Iraq to join the fight against the Islamic State."[15] Asked about these fighters, Jen Psaki, a spokesperson for the Obama administration's Department of State, expressed concern for their safety but stated that she was not aware of any law forbidding them from traveling abroad to join non-FTO military organizations fighting in Syria.[16] Under the Government's reasoning, though, these fighters, too, and those who support them, are violating §§ 2339A and 956(a).[17]

Moreover, the Government itself has supported—and authorized private citizens to support—the FSA in its combat against Assad. Under the terms of the license the Office of Foreign Assets Control (OFAC) granted to the SSG, the SSG could "export, reexport, sell, or supply to the [FSA] financial, communications, logistical, and other services."[18] The license did not except services used to fight against Assad. OFAC is not authorized to grant exceptions to § 2339A. Under the Government's reasoning, the SSG and everyone who gave to the SSG violated § 2339A, because the FSA took up arms to overthrow the Assad regime.

---

[15] Jason Ritz & Joseph Young, *Transnational "Volunteers": America's Anti-ISIL Fighters*, WAR ON THE ROCKS (Sept. 13, 2016), https://goo.gl/BCA6xF.

[16] Jen Psaki, *State Department Daily Briefing*, C-SPAN (Oct. 2, 2014), at 26:00-27:00, https://goo.gl/3dyACA.

[17] Outside the combatant immunity context, there's no blanket rule that it is not murder to kill a suspected ISIL fighter without a trial.

[18] DEP'T OF THE TREASURY, *Syrian Sanctions Regulations License* ("SSG License), License No. SY-2012-294747-1, https://goo.gl/YSpgo1.

Contrary to the Government's representation, the United States' support of the FSA and other rebel groups was not limited to the groups' opposition to ISIL.[19] The website for SSG, at the time OFAC granted it a license to support the FSA, stated that it would support only groups that assented to the FSA's proclamation of principles.[20] To this day, the FSA's proclamation of principles states that it "is a military structure" that "will fight if necessary to end the dictatorship of Assad."[21] Describing the FSA, the SSG's website explained, "The Free Syrian Army is a national coalition of affiliated *armed* rebel groups."[22] In August 2012, Reuters reported that President Obama had signed a covert "order authorizing U.S. support for rebels seeking to depose Syrian President Bashar al-Assad and his Government."[23] On June 2013, President Obama publicly "authorized his administration to provide arms to rebels fighting Syrian President Bashar al-Assad."[24]

Even if the United States' support for these groups were limited to their opposition to ISIL, though, their conduct would still violate §§ 2339A and 956(a) if combatant immunity did not apply in the Syrian Civil War. The combatant immunity doctrine is the only reason these groups are allowed to fight ISIL in Syria. After all, the United States would not condone extra-judicial killings

---

[19] And even if it were, it would still constitute violations of §§ 2339A and 956(a) under the Government's theory, because, outside the combatant immunity context, there's no blanket rule that it is not murder to kill a suspected ISIL fighter without a trial.

[20] SYRIAN SUPPORT GROUP, *Frequently Asked Questions* ("SSG FAQ"), https://goo.gl/Uvub6m (archived Aug. 27, 2013).

[21] NAT'L COAL. OF SYRIAN REVOLUTION & OPPOSITION FORCES, *FSA Proclamation of Principles*, https://goo.gl/7aJHdn (last visited Nov. 30, 2017).

[22] SYRIAN SUPPORT GROUP, *About FSA*, https://goo.gl/A4s1K7 (archived Oct. 28, 2012), https://goo.gl/Uvub6m.

[23] Mark Hosenball, *Obama Authorizes Secret Support for Syrian Rebels*, REUTERS (Aug. 1, 2012, 9:04 PM), https://goo.gl/IHDAzp.

[24] Adam Entous & Julian E. Barnes, *U.S. to Arm Syrian Rebels*, WALL ST. J. (June 14, 2013, 5:29 AM), https://goo.gl/Bh2Yh8.

of suspected terrorist in the United States. There is no "ISIL defense" to murder, but there is a combatant immunity defense.

Finally, President Obama declared that the SOC was "the legitimate representative of the Syrian people." According to the SOC website, "[t]he coalition will do everything in its power to reach the goal of overthrowing the Assad regime and bring victory to the revolution both inside and outside of Syria."[25] It makes no sense that the United States would declare a band of murderers to be the only legitimate representative of the Syrian people. More fundamentally, though, punishing Defendants for acts of combat against Assad would throw U.S. foreign policy on its head. The United States, under President Obama, declared that there is a civil war in Syria and that the SOC is the legitimate representative of the Syrian people. As Justice Marshall recognized in *Palmer*, in the context of a recognized civil war, to "consider criminal those acts of hostility which war authorizes . . . would be to determine that the war prosecuted by one of the parties was unlawful, and would be *to arrange the nation to which the court belongs against that party*." *Palmer*, 16 U.S. at 635 (emphasis added). In other words, punishing Defendants for acts of legitimate warfare against Assad would not only make no sense but would aid the Assad regime by arranging the United States against the Syrian opposition, contrary to U.S. policy set by the President of the United States.

**III.    Even if combatant immunity does not apply to Pazara's actions, Defendants have a mistake defense that would nullify the *mens rea* required for the charges offenses.**

Even if Defendants have not established the combatant immunity defense, the Government will still have to prove beyond a reasonable doubt that the Defendants intended to support and engage in a conspiracy to murder and maim. A layperson's understanding of combatant

---

[25] Nat'l Coal. Of Syrian Revolution & Opposition Forces, *Mission Statement and Goals*, https://goo.gl/ZWrXPT (last visited Nov. 30, 2017).

immunity—that killing and maiming by soldiers engaged in combat cannot, by definition, be murder or criminal behavior—is the basis for this "mistake" defense. Defendants all believed that Pazara was fighting in Syria as a soldier against the Assad regime. Their experience in the Bosnian War between 1992 and 1995 led them to believe that Pazara was fighting against a tyrannical regime that was attempting to impose its will by force of arms on the Syrian people in the same manner that the Serbs attempted to impose their will on Bosnians. Further, their friendship with Pazara before he went to Syria left them certain that he was genuinely outraged at the Assad regime's violent oppression of the opposition forces and sought to join the forces fighting against Assad. Their belief that he fought as a soldier in a civil war, even if mistaken, was genuine and sincere. Further, it negates the mental state element common to all three of the indictment's charges; that is, the intent to murder, maim, or kidnap, an essential element of all charges against defendants.

All three counts in the indictment center on an alleged violation of 18 U.S.C. § 956(a).[26] Count One accuses all defendants of violating 18 U.S.C. § 2339A by conspiring to provide material support to carry out a violation of section 956(a). Count Two alleges that defendants Hodzic and Rosic violated section 956(a). Count Three alleges a substantive violation of section 2339A by all the defendants for the purpose of violating section 956(a). Section 956(a) "applies to '[w]hoever . . . conspires with one or more other persons to commit at any place outside the United States, an act that would constitute the offense of murder.'" *United States v. Chhun,* 744 F.3d 1110, 1116

---

[26] "Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2)." 18 U.S.C. § 956(a)(1).

(9th Cir. 2014).[27] The elements of this offense are: "(1) the defendant agreed with at least one person to commit murder [or to kidnap or maim another person]; (2) the defendant willfully joined the agreement with the intent to further its purpose; (3) during the existence of the conspiracy, one of the conspirators committed at least one overt act in furtherance of the object of the conspiracy; and (4) at least one of the conspirators was within the jurisdiction of the United States when the agreement was made." *United States v. Obregon-Reyes,* 2013 WL 150114, at *6 (5th Cir. 2013). Accordingly, to convict defendants under all three counts of the indictment, the Government must prove that the defendants intended to commit murder. Federal law defines murder in 18 U.S.C. § 1111, as "the unlawful killing of a human being with malice aforethought."[28] Killing "with malice aforethought" means a deliberate and intentional killing. *See Chhun,* 744 F.3d at 1117. Thus, all three counts in the indictment require the Government to prove that defendants intended unlawful killing with malice aforethought or murder by deliberate and intentional killing.

Under the international law of armed conflict, "[t]he soldier has the right to kill another soldier."[29] "International humanitarian law (IHL) thus privileges certain forms of lethal violence, in particular that between soldiers. . . . In other words, in certain instances the laws of war sanction the completely unnecessary death of human beings."[30] Accordingly, a soldier's deliberate, intentional, premeditated killing of another soldier is not murder. *See Ambrose Light*, 25 F. at 415 ("[I]t is possible that the officers and crew [on a piratical vessel] might have accepted the

---

[27] Section 956(a) is not limited to murder it also covers the offenses of kidnapping and maiming. *See* 18 U.S.C. § 956(a). For simplicity, this memo will only refer to the offense of murder, but the analysis also applies to the additional offenses as well.

[28] 18 U.S.C. § 1111.

[29] Francoise Hampson, *Human Rights Law and International Humanitarian Law: Two Coins or Two Sides of the Same Coin?,* 1 BULL. OF HUMAN RIGHTS 46, 50 (1991).

[30] Samuel G. Walker, *Lawful Murder: Unnecessary Killing in the Law of War,* 25 CAN. J.L & JURIS. 417, 417 (2012).

commission upon such a reasonable supposition of its coming from an authorized belligerent as to furnish a just defense upon a criminal indictment, though none the less should the vessel and those who commissioned her be held engaged in an illegal and piratical expedition."). The distinction is definitional. The doctrine of combatant immunity justifies a soldier's killing in combat and immunizes him or her from prosecution for murder.[31] This is a very commonsense notion that is intuitively obvious to everyone. It requires neither legal education nor understanding of the Geneva Conventions to intuit the notion that a soldier's killing in the ordinary course of combat has nothing to do with murder, however horrible the combat might be.

Defendants understood this notion from painful, bitter experience. All of them came to the United States as refugees from the war in the former Yugoslavia between 1992 and 1995, which ravaged their homeland of Bosnia-Herzegovina. Like the current war in Syria, the 1992 to 1995 conflict in the former Yugoslavia was a civil war. Just as the Assad government in Syria possessed the only organized, institutional armed forces at the outset of the conflict, so too in Bosnia, Serbia's aggression against Croatia and Bosnia was aided by possessing the only modern army at the outset of the conflict. Consequently, Bosnia became the ideal territory for the creation and emergence of paramilitary soldiers resisting the Serbian Army.[32] Bosnian forces, especially at the outset of the conflict, depended on volunteers who fought in the chaos of a desperate defensive war.[33] The ethnic and sectarian viciousness of the Bosnian war prompted Muslims foreign fighters to aid Bosnian Muslims.[34] Estimates vary, but approximately 4,000 foreign fighters participated in this

---

[31] *Id.* at 418.

[32] CHARLES R. SHRADER, THE MUSLIM-CROAT CIVIL WAR IN CENTRAL BOSNIA, A MILITARY HISTORY, 1992-1994 35-38 (2003). Shrader focuses on a portion of the conflict in the former Yugoslavia between 1992 and 1995, specifically the conflict between Croatia and Bosnia, but his history necessarily details facts about the creation and nature of Bosnian forces in this period.

[33] *See id.* at 41-56.

[34] *See id.*

conflict.[35] Unquestionably, as with any war, reports of abuses and criminal behavior exist side by side with perceptions of foreign fighters coming to rescue threatened Islamic communities. Significantly, however, the defense is not aware of any foreign volunteers being prosecuted for war crimes by the International Criminal Tribunal for the former Yugoslavia. Inevitably, then, when Pazara announced his presence in Syria to his friends in the United States, their Bosnian war experience colored and shaped their understanding of his purpose, intentions, and role.

If the Court rules that Pazara does not qualify for combatant immunity, then Defendants' belief that Pazara was in fact fighting as a soldier shielded by combatant immunity from accusations of murder, becomes a genuine and sincere mistake. Defendants reasonably believed that Pazara fought as a soldier. If the Court finds this belief to be correct, they are innocent because it will be impossible for the government to prove that they had the intent to murder, maim, or kidnap.[36]

As Professor LaFave observes,

> the basic rule is extremely simple: ignorance or mistake of fact or law is a defense when it negatives the existence of a mental state essential to the crime charged. Indeed, it is so simple because, unlike the defenses discussed in later chapters, it is merely a restatement in somewhat different form of one of the basic premises of the criminal law. Instead of speaking of ignorance or mistake of fact or law as a defense, it would be just as easy to note simply that the defendant cannot be convicted when it is shown that he does not have the mental state required by law for commission of that particular offense. For example, to take the classic case of the man who takes another's umbrella out of a restaurant because he mistakenly believes that the umbrella is his, it is not really necessary to say that the man, if charged with larceny, has a valid defense of mistake of fact; it would be more direct and to the point to assert that the man

---

[35] *See id.* at 51-52.

[36] "[A] defendant may cast a reasonable doubt upon the existence of mens rea by showing that, under the circumstances, he reasonably believed the facts to be other than they were and that his actions would have been innocent had his belief been correct." *United States v. Goodwin,* 440 F.2d 1152, 1156 (3th Cir. 1971).

> is not guilty because he does not have the mental state (intent to steal the property of another) required for the crime of larceny. Yet, the practice has developed of dealing with such mistakes as a matter of defense, perhaps because the facts showing their existence are usually brought out by the defendant, but they are not so classified in this Treatise, so as to emphasize that (for the reasons stated above) it is commonly accepted that the prosecution is required to disprove the mental state-negating mistake beyond a reasonable doubt.[37]

Stressing this simplicity, the Eighth Circuit disparaged as "logomachy,"[38] efforts to complicate the simple rule with discussions of the subjectivity or objectivity of the defendant's belief or of the categorization of the applicable *mens rea* element as specific or general intent: "The applicable principle is that if a defendant reasonably though mistakenly believes facts that negate the mental state necessary for conviction of the offense with which he or she has been charged, the crime simply has not been committed." *United States v. Iron Eyes,* 367 F.3d 781, 784 (8th Cir. 2004). For defendants, their genuine, sincere belief that Pazara fought in Syria as a soldier negates any intent to commit murder, maiming, or kidnapping. This belief means that they committed no crime in supporting Pazara's fighting as a soldier.

Dated: December 1, 2017

Respectfully submitted,

*/s/ Charles D. Swift*
Charles D. Swift
Pro Hac Attorney for Defendant Harcevic
TX State Bar No. 24091964
Constitutional Law Center for Muslims in America
833 E Arapaho Rd, Suite 102
Richardson, TX  75081
(972) 914-2507
cswift@clcma.org

---

[37] WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 5.6 (Sept. 2014).
[38] *Logomachy—Definition*, MERRIAM-WEBSTER.COM, https://goo.gl/bwBzA4 (last visited Nov. 30, 2017) (defining "logomachy" as "a dispute over or about words").

*/s/ Catherine McDonald*
Catherine McDonald
Pro Hac Attorney for Defendant Harcevic
TX State Bar No. 24091782
Constitutional Law Center for Muslims in America
833 E Arapaho Rd, Suite 102
Richardson, TX  75081
(972) 914-2507
cmcdonald@clcma.org

*/s/ Diane Dragan*
Diane Dragan, Assistant Fed. Public Defender
Attorney for Defendant Ramiz Hodzic
1010 Market St., Suite 200
Saint Louis, Missouri 63101
Telephone: (314) 241-1255
Facsimile: (314) 421-3177
Diane_Dragan@fd.org

*/s/ Kevin Curran*
Kevin Curran, Assistant Fed. Public Defender
Attorney for Defendant Ramiz Hodzic
1010 Market St., Suite 200
Saint Louis, Missouri 63101
Telephone: (314) 241-1255
Facsimile: (314) 421-3177
Kevin_Curran@fd.org

*/s/ JoAnn Trog*
JoAnn Trog                42725MO
Attorney for Defendant Rosic
121 West Adams Ave.
Saint Louis, Missouri 63122-4022
Telephone:   314-821-1111
Facsimile:     314-821-9798
jtrogmwb@aol.com

*/s/Paul J. D'Agrosa*
Paul J. D'Agrosa (#36966MO)
Attorney for Defendant Sedina Hodzic
7710 Carondelet, Suite 200
Clayton, Mo. 63105
(314) 725-8019
(314) 725-8443 Fax
Paul@wolffdagrosa.com

21

*/s/ Andrea E. Gambino*
Andrea E. Gambino
Law Offices of Andrea E. Gambino
Co-Counsel for Defendant Mediha Salkicevic
53 W. Jackson Blvd., Suite 1332
Chicago, Illinois  60604
(312) 322-0014 or (312) 952-3056
fax:  (312) 341-9696
agambinolaw@gmail.com

*/s/ J. Christian Goeke*
J. Christian Goeke #39462MO
Co-counsel for Defendant Mediha Salkicevic
7711 Bonhomme Avenue
Suite 850
Clayton, MO 63105
(314) 862-5110
(314) 862-5943- Facsimile
chris@jcgoekelaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of <u>Defendants' Joint Reply to Government's Response to Defendants' Motion to Dismiss Counts One and Three</u> was electronically filed  and served on the Court's electronic filing system:

      DATED this 1st day of December, 2017.

*/s/ Charles D. Swift*
Charles D. Swift
Pro Hac Attorney for Armin Harcevic
833 – E. Arapaho Rd., Ste. 102
Richardson, TX  75081
Tel: (972) 914-2507
Fax: (972) 692-7454
cswift@clcma.org
